## CASE NO. 14-2166

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE TENTH CIRCUIT

PEGGY WALTON,

    Plaintiff-Appellee,

v.

NEW MEXICO STATE LAND OFFICE and
RAY POWELL,

    Defendants-Appellants.

On Appeal from the United States Court for the District of New Mexico
The Honorable District Judge James O. Browning
1:13-cv-00343-JB-SCY

## APPELLANT'S OPENING BRIEF

Respectfully submitted,

*/s/ Scott P. Hatcher*

Scott P. Hatcher
Emma D. B. Weber
150 Washington Ave., Suite 204
Santa Fe, New Mexico 87501
(505) 983-6525

# TABLE OF CONTENTS

PRIOR OR RELATED APPEALS ........................................................................... 1

JURISDICTIONAL STATEMENT ........................................................................... 1

A.  Basis For District Court's Subject Matter
    Jurisdiction ..................................................................................................... 1

B.  Basis For Appellate Court's Jurisdiction ........................................................ 1

C.  Filing Date Establishing Timeliness Of Appeal ............................................. 2

D.  Appeal From Final Order ................................................................................ 2

ISSUES PRESENTED FOR REVIEW ...................................................................... 2

STATEMENT OF THE CASE ................................................................................... 3

STATEMENT OF THE FACTS ................................................................................. 6

SUMMARY OF THE ARGUMENT ....................................................................... 18

ARGUMENT ............................................................................................................ 21

I.   Standard of Review ....................................................................................... 21

II.  The District Court Erred When Determining
     Plaintiff Satisfied The *Mcdonnell Douglas*
     Burden-Shifting Framework In Raising Material
     Fact Issues Sufficient To Avoid Summary
     Judgment On Her §1983 Claims Against
     Commissioner Powell ..................................................................................... 22

     A.  Summary Judgment Standards in the
         Qualified Immunity Context ...................................................................... 22

     B.  Walton does not have a Constitutionally
         Protected Interest in any Political Association
         with the Lyons Administration .................................................................. 26

|   | C. | Plaintiff Failed to Establish a *Prima Facie* Case Sufficient for a Reasonable Jury to Conclude that Commissioner Powell Violated her Constituitonal Right not to be the Subject of a Reduction in Force as a Result of any Political Affiliation with the Lyons Administration | 30 |
| | D. | Assuming Walton Establishes a *Prima Facie* Case for Discrimination on the Grounds of Political Association, Powell set forth Legitimate, Non-Discriminatory Reasons for the RIF of her GM I Position | 38 |
| | E. | The District Court Erred in Determining that Walton Produced Sufficient Evidence for a Jury to Conclude that Commissioner Powell's Proffered Reasons for the RIF of her GM I Position were Pretextual | 40 |
| III. | | Commissioner Powell's Decision To Approve The RIF Designed By Olah Was Objectively Reasonable Under The Circumstances And He Is Entitled to Qualified Immunity | 49 |
| CONCLUSION | | | 54 |
| CERTIFICATION | | | 55 |
| STATEMENT REGARDING ORAL ARGUMENTS | | | 55 |
| ADDENDUM TO APPELLANT'S OPENING BRIEF | | | 57 |

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Coors Brewing Co.*
181 F.3d 1171, 1180 (10th Cir. 1999) ........................................................... 42

*Anderson v. Creighton*
483 U.S. 635, 640 (1987).............................................................................. 49

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242, 251 (1986).............................................................................. 23

*Argo v. Blue Cross Blue Shield of Kansas, Inc.*
452 F.3d 1193, 1202 (10th Cir. 2006) ........................................................... 24

*Ashcroft v. Al-Kidd*
131 S.Ct. 2074, 2083 (2011).......................................................................... 51

*Barry v. Moran*
661 F.3d 696, 704 (1st Cir. 2011)...................................................... 24, 25, 27

*Bass v. Richards*
308 F.3d 1081 (10th Cir. 2002) ..................................................................... 27

*Beaird v. Seagate Tech, Inc.*
145 F.3d 1159, 1169 (10th Cir. 1998). .......................................................... 42

*Benton v. Adams County Board of County Commissioners*
303 Fed.Appx. 625 (10th Cir. 2008).................................................. 33, 34, 36

*Brown v. Reardon*
770 F.2d 896, 899 (10th Cir. 1985) ............................................................... 25

*Busey v. County of Shawnee, Kansas*
277 F.Supp.2d 1095 (D. Kansas 2003).......................................................... 28

*Correa-Martinez v. Arrillaga-Belendez*
903 F.2d 49, 57 (1st Cir. 1990)...................................................................... 27

*Crawford-El v. Britton*
523 U.S. 574, 574-75 (1998) ......................................................................... 50

*Douglas v. Dobbs*
419 F.3d 1097, 1100 (10th Cir. 2005). ........................................................... 26

*Durant v. Ind. Sch. Dist. No. 16, of LeFlore Cnty., State of Oklahoma*
990 F.2d 560, 564 (10th Cir. 1993) ................................................................. 37

*EEOC v. C.R. England, Inc.*
644 F.3d 1028 (10th Cir. 2011) ......................................................... 40, 41, 49

*EEOC v. Flasher Company, Inc.*
986 F.2d 1312, 1316 (10th Cir. 1992) ............................................................ 40

*Elrod v. Burns*
427 U.S. 347, 359 (1976)......................................................................... 26, 27

*Gann v. Cline*
519 F.3d 1090 (10th Cir. 2008) ...................................................................... 37

*Garcetti v. Ceballos*
547 U.S. 410, 420 (2006 .............................................................................. 24

*Garrett v. Barnes*
961 F.3d 629 (7th Cir. 1991).......................................................................... 28

*Gibson v. Am. Greetings Corp.*
670 F.3d 844, 856 (8th Cir. 2012) .................................................................. 41

*Gilkey v. Siemens Energy and Automation, Inc.*
125 Fed.Appx. 908 (10th Cir. 2005)......................................................... 42, 45

*Gonzales v. City of Elgin*
578 F.3d 526, 540 (7th Cir. 2009) .................................................................. 50

*Haigh v. Gelita USA, Inc.*
632 F.3d 464, 470 (8th Cir. 2011) .................................................................. 41

*Harlow v. Fitzgerald,* 457 U.S. 800 (1982) ................................................. 21, 51, 55

*Hart v. Dillon Companies, Inc.*

2014 W.L. 6819724, at *9 (D. Colo. 2014)................................................... 24

*Hope v. Pelzer*
536 U.S. 730, 739 (2002).............................................................................. 50

*Jackson v. NTMEDIA, LLC*
199 Fed.Appx. 653, 664 (10th Cir. 2006)..................................................... 49

*Jantzen v. Hawkins*
188 F.3d 1247 (10th Cir. 1999) ..................................................................... 28

*Johnson v. Securitas Security Services USA, Inc.*
769 F.3d 606, 612 (8th Cir. 2014) ................................................................. 41

*Johnson v. Weld County, Colorado*
594 F.3d 1202, 1211 (10th Cir. 2010) ........................................................... 41

*Klug v. Chicago School Reform Board of Trustees*
197 F.3d 853, 857 (7th Cir. 1999) ................................................................. 27

*Laidley v. McClain*
914 F.2d 1386 (10th Cir. 1990) .................................................. 45, 46, 47, 48

*Lewis v. Tripp*
604 F.3d 1221, 1225, (10th Cir. 2010). ......................................................... 22

*Lucas v. Dover Corp.*
857 F.2d 1397, 1403-04 (10th Cir. 1998)...................................................... 42

*Maestas v. Segura*
416 F.3d 1182, 1188-89 (10th Cir. 2005)...................................................... 34

*Malley v. Briggs*
475 U.S. 335, 341 (1986).............................................................................. 51

*Martinez v. Beggs*
563 F.3d 1082, 1088 (10th Cir. 2009) ........................................................... 23

*Mason v. Oklahoma Turnpike Authority*
115 F.3d 1442 (10th Cir. 1997) ..................................................................... 28

*McDonnell Douglas Corp. v. Green*
  411 U.S. 792 (1973)............................................ 20, 24, 26, 39, 40, 42, 54, 55

*McGarry v. Board of County Commissioners of County of Pitkin*
  175 F.3d 1193, 1201 (10th Cir. 1999). .................................................... 24, 25

*Medina v. Cram*
  252 F.3d 1124, 1128 (10th Cir. 2001). ......................................................... 26

*Meneley v. Shawnee County*
  379 F.3d 949, 954 (10th Cir. 2004) ............................................................... 49

*Mincin v. Vail Holdings, Inc.*
  308 F.3d 1105, 1108 (10th Cir. 2002) ........................................................... 21

*Mitchell v. Forsyth*
  472 U.S. 511 (1985)........................................................................................ 2

*New York Times Co. v. Sullivan*
  376 U.S. 254, 270 (1964)............................................................................... 27

*Pahls v. Thomas*
  718 F.3d 1210, 1228 (10th Cir. 2013). ......................................................... 22

*Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir. 1997)...................... 35, 42

*Rutan v. Republican Party of Illinois*
  497 U.S. 62, 76 (1990),................................................................................. 40

*Saucier v. Katz*
  533 U.S. 194, 202 (2001)............................................................................... 50

*Scott v. Harris*
  550 U.S. 372, 380 (2007)............................................................................... 22

*Six v. Henry*
  42 F.3d 582 (10th Cir. 1994)......................................................................... 47

*Texas Dept. of Community Affairs v. Burdine*
  450 U.S. 248, 255 (1981)............................................................................... 39

*Thomas v. International Business Machines*
48 F.3d 478, 485 (10th Cir. 1995) ................................................................ 23

*Thomson v. Salt Lake County*
584 F.3d 1304, 1312 (10th Cir. 2009) .......................................................... 25

*Timmerman v. U.S. Bank, N.A.*
483 F.3d 1106, 1113, (10th Cir. 2007). ........................................................ 41

*Truck Insurance Exchange v. MagneTek, Inc.*
360 F.3d 1206, 1216 (10th Cir. 2004 ........................................................... 23

*Vitkus v. Beatrice Company*
11 F.3d 1535, 1539 (10th Cir. 1994) ............................................................ 23

*Wrobel v. County of Erie*
692 F.3d 22, 28 (2nd Cir. 2012) ................................................................... 27

## Federal Rules of Procedure

Fed.R.Civ.P. 12(b)(6) .................................................................................... 38

Fed.R.Civ.P. 56 ............................................................................................. 22

## Statutes

28 U.S.C. §1291 ..................................................................................... 1, 2, 21

28 U.S.C. §1441(A-B).................................................................................... 1

42 U.S.C. § 1983 .................................................................................. 1, 18, 23

New Mexico Personnel Act, NMSA §10-9-1, *et seq.* ................................... 4

New Mexico Whistleblower Protection Act, NMSA §10-16C-1 ............................ 3

New Mexico Human Rights Act, NMSA §28-1-7(A) ............................................ 3

# Regulations

N. M. Code 1.7.1.7(G) ............................................................................................... 4

N. M. Code 1.7.1.7(S) ............................................................................................... 4

N. M. Code 1.7.10.9(D) .......................................................................................... 10

N. M. Code 1.7.10.9(B)(5) ..................................................................................... 18

## PRIOR OR RELATED APPEALS

There are no prior or related appeals with regard to the issues before this Court.

## JURISDICTIONAL STATEMENT

### A.    Basis For District Court's Subject Matter Jurisdiction

This case was filed originally in the First Judicial District Court for the State of New Mexico, County of Santa Fe, No. D-101-CV-2012-03548, and removed on April 11, 2013, to the United States District Court for the District of New Mexico pursuant to 28 U.S.C. §1441(A) and (B). Plaintiff's claims include actions founded on rights arising out of the constitution, treaties, or laws of the United States.

### B.    Basis For Appellate Court's Jurisdiction

Defendant-Appellant, Ray Powell, former New Mexico Commissioner for Public Lands (Commissioner Powell)[1], is appealing the district court's denial of his Motion for Summary Judgment on grounds of qualified immunity concerning the claims of Plaintiff-Appellee Peggy Walton (Walton) against him in his personal capacity under 42 U.S.C. § 1983 on grounds of retaliatory discrimination under the First and Fourteenth Amendments. The Court of Appeals has jurisdiction over appeals from all final decisions of the United States District Court. 28 U.S.C. §1291. Further, this Court has jurisdiction over direct interlocutory appeals filed from the

---

[1] Commissioner Powell's term ended December 31, 2014.

1

district court's denial of a Motion for Summary Judgment on qualified immunity grounds pursuant to *Mitchell v. Forsyth*, 472 U.S. 511 (1985).

## C.   Filing Date Establishing Timeliness Of Appeal

The district court's Memorandum Opinion and Order (MOO) denying the Motion for Summary Judgment on qualified immunity grounds as to Commissioner Powell was entered on September 12, 2014, Docket No. 91. (Aplt. App. at 451-564). The Court's Order denying the Motion was entered on August 27, 2014, Docket No. 86. (Aplt. App. at 449-450). The Notice of Appeal was timely filed on September 18, 2014, Docket No. 92. (Aplt. App. at 565-566). The deadline to file Appellant's opening brief and appendix is January 7, 2015 pursuant to 10th Circuit Rule 33.1(F) and Court extension granted November 21, 2014.

## D.   Appeal From Final Order

The MOO denying Commissioner Powell's Motion for Summary Judgment is subject to direct appeal and is an appealable "final decision" within the meaning of 28 U.S.C. § 1291 and *Mitchell v. Forsyth*, 472 U.S. 511 (1985).

## ISSUES PRESENTED FOR REVIEW

Whether Walton had any constitutionally protected interest in a political association with the predecessor Lyons Administration; whether the district court erred in determining that Walton established a *prima facie* case under Count VI of her Second Amended Complaint sufficient for a reasonable jury to conclude that

Commissioner Powell, as the New Mexico Commissioner for Public Lands, violated a constitutional or statutory right; whether Commissioner Powell considered, as a substantial and motivating factor, Walton's political association with the predecessor Lyons Administration in approving a legislatively mandated reduction in force (RIF) resulting in the termination of her General Manager I (GM I) position with the New Mexico State Land Office (NMSLO); whether Commissioner Powell offered legitimate, non-discriminatory reasons for the RIF, and, if so, whether Walton met her burden of showing Commissioner Powell's proffered reasons were pretextual. Further, under the specific circumstances of this case, were Commissioner Powell's actions objectively reasonable in light of clearly established law such that he is entitled to qualified immunity?

## STATEMENT OF THE CASE

Walton, who held a GM I position with the NMSLO at all material times, filed her Amended Complaint in New Mexico state district court on April 2, 2013, against Commissioner Powell and two other employees of the agency, Donald Britt and Del Bearden, alleging sexual and national origin discrimination in violation of the New Mexico Human Rights Act (NMHRA), NMSA §28-1-7(A), unlawful retaliation under the NMHRA, violation of the New Mexico Whistleblower Protection Act (WPA), NMSA §10-16C-1, and violation of her rights under the First and Fourteenth Amendments to the United States Constitution, including her right to engage in

3

political association without reprisal by state officials and the right to speak on matters of public concern. (Aplt. App. at 15-22). After Defendants removed the case to the United States District Court for the District of New Mexico on April 11, 2014, (Aplt. App. at 13-14), Walton filed her Second Amended Complaint on August 2, 2013, adding claims for sexual and national origin discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964. (Aplt. App. at 77-86). Walton, who was hired into the agency during the administration of former Commissioner for Public Lands, Patrick Lyons, first in an exempt Secretary II position[2] and later into the classified position of Economist A which was reclassified to a GM I position in the Commercial Resources Division (CR Division), continued as a classified employee with the agency after Commissioner Powell came into office on January 1, 2011, following his electoral victory in November 2010 over the Republican candidate, Matthew Rush. (Aplt. App. at 78; 97-98). Former Commissioner Lyons served in that capacity for two terms, the second of which expired on December 31, 2010. (Aplt. App. at 97; 230). He did not run for re-election against Ray Powell. (Aplt. App. at 230). Walton's GM I position was the subject of a legislatively mandated RIF, effective July 1, 2011. (Aplt. App. at 96-100). She generally claims her GM I position was targeted for the RIF by

---

[2] Under the New Mexico Personnel Act, NMSA 1978, § 10-9-1 *et seq.*, certain employees are exempt from coverage under the Act. *See* NMSA 1978, § 10-9-4; 1.7.1.7(S) NMAC. "Classified" positions are those covered under the Act. 1.7.1.7(G), NMAC.

Commissioner Powell and her immediate supervisor, Donald Britt, due to her political association with the Lyons Administration. (Aplt. App. at 79-80). She also claims sexual and national origin discrimination against the NMSLO, Britt, and Del Bearden, over whom Walton had supervisory control. (Aplt. App. at 81).

Defendants moved for summary judgment on all of Walton's claims, which totaled six separate counts. (Aplt. App. at 96-180). On August 27, 2014, the district court, following hearing on April 9, 2014, granted summary judgment on Count II (Retaliation and Violation of the NMHRA), Count IV (Retaliation and Violation of the Civil Rights Act), and Count V (Violation of the WPA). (Aplt. App. at 447-48). The Court denied summary judgment on the §1983 claims against Commissioner Powell, in his individual capacity, Count VI (Damages for Violations of Constitutional Rights). (Aplt. App. at 447-48). Previously, Walton voluntarily dismissed her claims for discrimination based on sex and national origin against individual Defendants Britt and Bearden under Counts I and III of the Plaintiff's Second Amended Complaint. (Aplt. App. at 445-46). Walton also dismissed Count VI to the extent it asserted claims against Commissioner Powell on grounds of her right to speak about matters of public concern. (Aplt. App. at 445-46).

## STATEMENT OF THE FACTS

Commissioner Powell was the New Mexico Commissioner for Public Lands from January 1, 2011, following his election to that position in the November 2010 election, until December 31, 2014. (Aplt. App. at 97).

Judge Browning, in his MOO, correctly determined Walton's remaining claims under Count VI did not include one for retaliation on the basis of her membership in the Republican Party. (Aplt. App. at 553-54). Rather, Walton's claims against Commissioner Powell were narrowed to one for retaliation due to her political association with the Lyons Administration under the First and Fourteenth Amendments. (Aplt. App. at 551-54). Commissioner Powell, a Democrat, succeeded former Commissioner Pat Lyons, a Republican. (Aplt. App. at 78). Commissioner Lyons did not oppose Commissioner Powell in the election. (Aplt. App. at 230). Walton was employed with the NMSLO from August 2008 through July 1, 2011, thus overlapping the two administrations. (Aplt. App. at 78-79). Walton was hired originally by Commissioner Lyons into a Secretary II position, one which is exempt from the provisions of the New Mexico Personnel Act, NMSA 1978, §10-9-1, *et seq.* (Aplt. App. at 229). In early 2009, Commissioner Lyons asked Sandra Lopez, the NMSLO Human Resources Director, whose career also overlaps both administrations, to transfer Walton into a classified Economist A position for which Walton had applied. (Aplt. App. at 229). Lopez processed and

6

approved Walton's transfer. (Aplt. App. at 400-402). Lopez approved this transfer because she felt Walton met the "equivalency" criteria for the job due to her experience although not necessarily on the education criteria. (Aplt. App. at 400-402). Later, Lopez was asked to reclassify Walton's position from Economist A to a GM I position in the NMSLO's CR Division. (Aplt. App. at 400-402). The reclassification was carried out by Lopez when she signed off on a Position Assignment Documentation Form C (PADF) approving, on behalf of the HR office, reclassification of Walton's position into GM I, effective August 3, 2010. (Aplt. App. at 402-407). When Walton's position was reclassified from Economist A to GM I, for which she was properly qualified, Commissioner Lyons directed this through Lopez who, in turn, obtained the necessary approval for the reclassification through the New Mexico State Personnel Office (SPO). (Aplt. App. at 402-407). In the course of the reclassification Lopez never took the position Walton was not qualified for the GM I position. (Aplt. App. at 402-407). Although Walton was technically not qualified on the education criteria for the job, she did have what Lopez described as the experience "equivalency" which allowed Lopez to approve Walton's reclassification. (Aplt. App. at 403).

In the fall of 2010, the Lyons Administration submitted its annual fiscal year agency budget for Fiscal Year 2012 (to begin July 1, 2011) to the New Mexico Legislative Finance Committee and Department of Finance and Administration.

(Aplt. App. at 98; 123-124).     Commissioner Lyons, for reasons unclear,
recommended reduction in the number of full time agency employees (FTE) from
153 to 151 and a corresponding reduction of appropriations by the legislature for
payment of salaries and benefits in the amount of $609,000.00. (Aplt. App. at 97-
98; 123-124; 130; 224). In January 2011, Elaine Olah (Olah), who assumed the
position of Assistant Commissioner for Administrative Services for Commissioner
Powell when he took office, reviewed the Lyons' proposed budget and, at the
direction of Commissioner Powell, led an effort during the 2011 New Mexico
legislative session to recapture the two FTEs and corresponding appropriations
reduction.  (Aplt. App at 98; 122; 224-226; 312-313).  She attended a House
Appropriations and Finance Committee hearing on February 7, 2011, advocating
that the loss of two FTE's and reduction in appropriations for salaries and benefits
to employees was not warranted and should be restored to the agency. (Aplt. App.
at 123-125; 224-226). Nonetheless, the New Mexico Legislature passed the General
Appropriations Act that April, signed into law by Governor Susana Martinez, which
established an agency-wide reduction in the two FTEs and budget effective July 1,
2011.  (Aplt. App. at 97-98; 123-125). It was shortly after the February 7, 2011,
hearing, when the efforts to recapture the FTE's appeared unsuccessful, that Olah
was tasked by Commissioner Powell to formulate a reduction in force (RIF) plan in
order to comply with the anticipated cuts. (Aplt. App. at 98; 310-313).

8

Olah testified in the case below that she conducted an analysis of the organizational structure looking at how the divisions were aligned and, as she put it, for "anomalies," in order to meet the budget cuts. (Aplt. App. at 98-99; 132). In formulating the RIF plan, which required approval through the SPO, Olah did not contemplate Walton, did not know Walton, nor did Olah take into consideration any of Walton's employment history with the NMSLO. (Aplt. App. at 103-105; 127-128; 224-226). Specifically, Olah did not consider nor was she aware that Walton had been hired into an exempt Secretary II position by Commissioner Lyons and later transferred to a position that was then reclassified. (Aplt. App. at 104; 127; 224-226). Olah was unaware of Walton's registration in or any activity as a member of the Republican Party. (Aplt. App. at 224-226). Importantly, Olah worked without any oversight from or consultation with Commissioner Powell in preparing her RIF plan. (Aplt. App. at 103; 135-140). Olah testified that during her work on the RIF plan, none of her superiors asked about Walton nor did she ever discuss Walton with the Commissioner. (Aplt. App. at 135-136). Olah completed her analysis and was ready to make her RIF recommendations as of March 30, 2011. (Aplt. App. at 133; 294).

Olah met with Commissioner Powell on April 6, 2011 to present her plan for approval. (Aplt. App. at 100; 140-142). Commissioner Powell was not made aware of the specifics of Olah's RIF plan or which positions would be eliminated in order

9

to meet the legislatively mandated cuts before that time. (Aplt. App. at 103; 310).
At that meeting Olah recommended the elimination of one vacant position in her
own division and one occupied position, specifically a GM I position in the CR
Division. (Aplt. App. at 138-142). This met the mandate of eliminating two FTEs.
(Aplt. App. at 138-142). Two GM I positions existed on the organizational chart in
the CR Division, which was described by Olah as "an anomaly." (Aplt. App. at 132-
133). Olah explained that, as such, the structure of the CR Division was out of sync
with the rest of the agency, especially because one GM I position had numerous
subordinates to supervise, the other had none. (Aplt. App. at 132-133). Her plan
was to combine the two positions into one GM I position. (Aplt. App. at 132-133).
Because of a SPO regulation requiring that "the order of layoff due to reduction in
force shall be by service date which is determined based upon the agency hire date,"
(*see* 1.7.10.9(D) NMAC), and because Walton had less seniority than the individual
occupying the other GM I position, it was Walton's position which was eliminated
through the RIF. (Aplt. App. at 99; 175-176). Commissioner Powell approved
Olah's plan which, in turn, was approved by the SPO and made effective as of June
30, 2011. (Aplt. App. at 310-312). When asked in her deposition about any other
organizational "anomalies," Olah did mention NMSLO's Oil, Gas, and Minerals
Division, responsible for oil and gas leasing activity as well as royalty collection and
distribution. (Aplt. App. at 434). That division also had two GM I positions, one

responsible for royalty management, the other responsible for oil, gas, and mineral leasing. (Aplt. App. at 434). Olah explained that each of the two GM I positions in Oil, Gas, and Minerals were warranted, in part because that division was much larger in size and scope than the CR Division. (Aplt. App. at 434). She mentioned, for example, that the CR Division generated revenues were approximately $6 million annually compared to the Oil, Gas, and Minerals Division which generated "$500 plus million." (Aplt. App. at 434). She explained that due to the differences in the "scope of the responsibilities and the size of the staff," the Oil, Gas, and Minerals Division warranted two GM I positions whereas the CR Division did not. (Aplt. App. at 434).

As a result of Olah's RIF plan, NMSLO was able to meet the requirements of the General Appropriations Act. (Aplt. App. at 105; 142). Had Olah simply eliminated two vacant FTE's, there would have been no savings for salaries and benefits and the agency would have run a budget deficit of $95,000.00. (Aplt. App. at 142). Instead, as a result of Olah's RIF plan the agency had a $70,000.00 surplus. (Aplt. App. at 142). Olah was also asked by Walton's counsel why not "restructure" the CR Division in a way which would have kept Walton employed. (Aplt. App. at 137). Olah explained this would require reclassifying and downgrading one of the two GM I positions which she described as an adverse employment action,

something she felt "was not the best way to proceed." (Aplt. App. at 137-138; 296-297).

Prior to Commissioner Powell taking office Walton was a subject of an investigative report aired November 23, 2010, on KRQE television by investigative reporter Larry Barker. (Aplt. App. at 232; 303). Barker reported that Walton was "distinctly unqualified" for her job, although not specifying whether this referred to her original exempt Secretary II position or the two classified positions she held. (Aplt. App. at 232). Neither Lopez, in her role as HR Director, nor anyone else in the agency, viewed Walton as unqualified for either of the two classified positions. (Aplt. App. at 400-407). In fact, aside from Barker's unsupported statements in his report, there is nothing in the record supporting the conclusion Walton was unqualified for the jobs she held with the agency.

Barker's story, titled "Cronies Move Up as Officials Move Out," featured certain New Mexico state employees, including Walton, portraying them as beneficiaries of Lyons' "cronism" because they allegedly were given jobs for which they were not qualified. (Aplt. App. at 232). In this case, Walton claims that her status as a beneficiary of so-called "cronyism" with the Lyons Administration proved a motivation for her position being eliminated through the RIF Commissioner Powell was required to accomplish. (Aplt. App. at 247-248). Coming shortly after his election, Commissioner Powell naturally viewed the

12

broadcast. (Aplt. App. at 305). He acknowledged receiving a phone call from Walton in an apparent effort by her to explain the circumstances of the Barker story before it aired and secure her job in the new administration. (Aplt. App. at 304). Commissioner Powell testified he did not know who Walton was when she called, nor did he know what to make of that phone call. (Aplt. App. at 304-305). Commissioner Powell stated he recalled little of that conversation except that "it didn't really make sense" to him. (Aplt. App. at 304-305). When asked in deposition by Walton's counsel what he thought of Larry Barker's work in general, Commissioner Powell replied he believed Barker to be the "gold standard for investigative reporting" because "he's done it for a number of decades, and I think most people view his work as being thorough and vetted. . . ." (Aplt. App. at 304-305)[3]. Describing the story as "hard hitting," when asked "whether he believed what Larry Barker said about Peggy Walton," Commissioner Powell testified: "I've learned not to ascribe too much to anything on TV, but I had no reason to disbelieve it. There was no counter to it." (Aplt. App. at 306).

Walton continued in her GM I position following the start of the new Powell Administration, a position she actively held until June 10, 2011, when she was notified that her GM I position was the one filled FTE subject of the RIF. (Aplt.

---

[3] The Court can take judicial notice that according to the KRQE website, Barker is an award winning reporter who has been in the field of investigative broadcasting in Albuquerque since 1975.

13

App. at 239). Prior to that, on January 27, 2011, Walton had her personal attorney, Linda G. Hemphill, Esq., again in a pre-emptive attempt to save her job in light of the negative publicity courtesy of Mr. Barker, write a letter to Commissioner Powell outlining the history of Walton's hiring into the agency in an exempt position and transfer and reclassification on two occasions during the Lyons Administration. (Aplt. App. at 268-271). Among other things in that letter, Hemphill highlighted the Barker KRQE story and concluded by suggesting that the Commissioner disseminate the letter to Walton's supervisory chain of command or other appropriate individuals so as to "nip in the bud any ongoing suggestion or insinuation that Walton was unqualified or that she engaged in any past wrongdoing." (Aplt. App. at 268-271). Although Commissioner Powell did not deny receiving the letter, he had only a vague recall of it and testified that he likely turned it over to legal counsel for any necessary follow up. (Aplt. App. at 307-308). Commissioner Powell was unaware of any follow up to that letter and there is nothing in the record suggesting any follow up was undertaken. (Aplt. App. at 308). From the KRQE story and receipt of the Hemphill letter, Commissioner Powell acknowledges he was at least constructively aware of Walton's work history with the agency. (Aplt. App. at 306).

On April 14, 2011, at a meeting of the New Mexico State Land Trusts Advisory Board, which assists the Commissioner in policy formulation, a number of staff members including Walton, whose GM I position was otherwise titled Director

14

of Commercial Leasing within the CR Division, were in attendance. (Aplt. App. at 160). Commissioner Powell gave welcoming remarks, some of which were critical of the operations of the agency during the Lyons Administration. (Aplt. App. at 272-274). These criticisms were expressed in the context of discussing changes going forward, including the need for transparency and accountability. (Aplt. App. at 272-274). For example, Commissioner Powell referenced a 2010 audit of the Lyons Administration by State Auditor, Hector Balderas, described by the Commissioner as "scathing" in terms of its disclosure of various wrongdoing during that time. (Aplt. App. at 274). Commissioner Powell was concerned enough that he turned the audit over to the New Mexico Attorney General, the U.S. Attorney, and the District Attorney for any possible legal action. (Aplt. App. at 274). In this context, Commissioner Powell noted that following the audit there had been a series of interviews by investigative reporters like Larry Barker which were featured on television statewide. (Aplt. App. at 274). Commissioner Powell then discussed the future commitment of his administration to transparency and accountability which was, in his mind, an obvious contrast to the workings of the Lyons Administration. (Aplt. App. at 274). Speaking four months into his administration, Commissioner Powell discussed standards of behavior and work expected of employees within the NMSLO and commented on the fact that there were "excellent employees that were still here [from the Lyons Administration] that were doing the best they could having

15

been disconnected from the process." (Aplt. App. at 274). He noted a concern about what he identified as "protected employees," those who "didn't have to meet the leadership criteria within the divisions, and somehow got directions from the front office." (Aplt. App. at 274). He noted further how, by reconstituting HR, matters had changed so that all employees now were "protected, so that everyone was treated fairly, and no one is victimized." (Aplt. App. at 274). When asked in his deposition who he was referring to by use of the term "protected employees" in the context of not having to "meet the leadership criteria within the divisions," Commissioner Powell testified that he was referencing two specific individuals, neither of whom were Walton. (Aplt. App. at 413). There is nothing in the minutes of this meeting or otherwise in the record suggesting Powell intended the term "protected employees" to include those who "received directions from the front office to bypass the ordinary chain of command," as apparently determined by the Court below in its MOO. (Aplt. App. at 558). In fact, there is nothing in the record demonstrating Walton fit within the description of personnel the Commissioner was referencing in these remarks. Recall, Lopez, the HR Director, approved both Walton's transfer and reclassification and believed Walton to be qualified for both classified positions she held during both administrations. (Aplt. App.at 400-407).

At no time during her work with the Powell Administration did Walton speak out on issues of public concern or matters indicating support for a particular political

ideology. (Aplt. App. at 104). During the time she was designing the RIF, Olah had no knowledge of the Larry Barker KRQE investigative story or that anyone was suggesting Walton was an unqualified beneficiary of Lyons' alleged cronyism. (Aplt. App. at 104). Olah had no knowledge of Walton's employment history of having been placed into an exempt position and later transferred and reclassified into classified positions. (Aplt. App. at 104). The record is devoid of any discriminatory animus toward Walton on the part of Olah or Commissioner Powell, for that matter. (Aplt. App. at 105).

The RIF plan was presented to the SPO for approval on June 10, 2011. (Aplt. App. at 311). The SPO approved the plan at its board meeting that day. (Aplt. App. at 175-76). Following that approval, Walton was notified of the RIF and placed on administrative leave until her position was eliminated effective July 1, 2011. (Aplt. App. at 175-176). Commissioner Powell sent an email to all NMSLO employees informing them of the RIF decision and elimination of Walton's position. (Aplt. App. at 311-312). He explained the "decision was difficult, but necessary," before going on to discuss the reasons for it. (Aplt. App. at 287). He stated: "The action taken today is the first step in adjusting to our reduced resources, but it won't completely solve our financial limitations." (Aplt. App. at 287). Commissioner Powell sent the email, in part, to inform people, stop the "rumor mill," and to prevent Walton from being vilified. (Aplt. App. at 311-312).

In his action approving the Olah RIF plan, Commissioner Powell stated he regretted having to lose any positions, but that he relied on and had confidence in Olah in devising a RIF plan consistent with the General Appropriations Act and the best interests of the agency. (Aplt. App. at 310-313). Walton was notified of a "right of first refusal" for available hires within the agency under NMAC 1.7.10.9. (Aplt. App. at 424-425). That provision allowed Walton the right to take any job within the agency for which she qualified and which was being filled until July 1, 2011, "the first effective date of layoff as defined in the plan." (Aplt. App. at 424-425; §1.7.10.9(B)(5) NMAC). In fact, no positions between the leave date of June 10 and her layoff date of July 1 were being actively filled. (Aplt. App. at 414-417). As a result, Walton was not offered any position for re-hire during that time. (Aplt. App. at 414-425).

## SUMMARY OF THE ARGUMENT

The district court denied Commissioner Powell's Motion for Summary Judgment on Walton's §1983 claims. Walton claims the Commissioner discriminated against her in violation of her protected rights of political association with the predecessor Lyons Administration during the course of a legislatively mandated RIF. The lower court found Walton produced evidence sufficient for a jury to find factual inferences supporting an award against Commissioner Powell. The Court found Walton made a *prima facie* showing of a violation of her

constitutional rights of political association and pretext in response to Commissioner Powell's proffer of a legitimate, nondiscriminatory reason for the selection in the RIF of Walton's GM I position in the NMSLO's CR Division. The court's ruling is based on legally insufficient or unsupported evidence in the record, much of which requires the jury to engage in undue speculation and conjecture.

When entering office in January 2011, Commissioner Powell, along with his Assistant Commissioner for Administrative Services, Elaine Olah, was confronted with his predecessor's budget reduction request to the legislature for fiscal year 2012, which included a reduction in force (RIF) of two FTE's. Despite efforts to save the NMSLO from the Lyons Administration budget request and have all requested cuts of personnel and appropriations restored, the legislature passed, and Governor Susana Martinez approved, the General Appropriations Act during the 2011 legislative session, imposing those cuts on the new Powell Administration. Olah was tasked with the design and implementation of those cuts through a RIF plan which required approval from the SPO. Olah had virtually no material personal or professional knowledge of Walton, including knowledge of any party affiliation, political activity or beliefs, or any other information which could potentially provide her with any discriminatory animus with which to target Walton's GM I position in the RIF on the grounds of her political association with former Commissioner Lyons.

Olah presented her plan to terminate Walton's position in a meeting with Commissioner Powell on April 6, 2011. This was the first notice he had of Olah's recommendations. The Commissioner did nothing to influence Olah's work nor did he have any specific involvement or oversight into the development of the RIF plan. At the time he approved Olah's plan, Commissioner Powell knew of Walton's history with the NMSLO as an exempt hire into the agency in 2008 and transfer and reclassification into two classified positions, for which investigative reporter Larry Barker alleged she was unqualified. The Powell Administration, through its own HR Director, Sandra Lopez, never believed Walton was unqualified for those positions or that she was the beneficiary of Commissioner Lyons' "cronyism," as alleged in the Barker report. There is no evidence in the record the Commissioner knew that Walton was a registered Republican, had campaigned against him in the November 2010 election, or held any political beliefs or engaged in political activity antagonistic to the Powell Administration.

The Court below erred in determining Walton had any protected interest in a political association with Mr. Lyons or his administration. Also, the district court failed to appropriately apply the three step framework under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) in determining Walton satisfied her burden of showing evidence sufficient for a jury issue that Commissioner Powell violated her constitutional right to political affiliation in the face of his qualified immunity

defense. Specifically, the district court relied on inappropriate inferences and speculation from undisputed facts of record in finding a *prima facie* case for discrimination and unlawful pretext for the decision of the Commissioner approving Olah's RIF plan. The Court also inappropriately relied on facts not supported in the record below.

The district court erred in its application of the objective reasonableness test of *Harlow v. Fitzgerald,* 457 U.S. 800 (1982) in determining that Commissioner Powell was not entitled to qualified immunity even assuming Walton showed facts sufficient for a jury determination on whether he violated her constitutional rights of free political association.

For these reasons, more fully explained below, the Court should reverse the district court's order denying summary judgment to Commissioner Powell under Walton's Count VI in her Second Amended Complaint.

## ARGUMENT

### I. Standard of Review

A district court ruling denying summary judgment on a claim of qualified immunity by a public official in his individual capacity is an appealable "final decision within the meaning of 28 U.S.C. §1291" and is the subject of *de novo* review. *Mincin v. Vail Holdings, Inc.,* 308 F.3d 1105, 1108 (10th Cir. 2002). This includes the district court's interpretation of applicable law. *Id.* at 1108-09.

21

Ordinarily, on review of qualified immunity determinations, this Court does not consider questions about what facts a reasonable jury might find. That lies within the province of the district court. *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010). The appellate court is limited to a review of the lower court's legal conclusions, specifically "whether the district court's factual determinations taken as true, suffice to show a violation of law, and further, whether that law was clearly established at the time of the alleged violation." *Pahls v. Thomas*, 718 F.3d 1210, 1228 (10th Cir. 2013). This rule is, however, subject to certain exceptions, at least two of which may have application here. First, this Court may determine for itself which factual inferences a reasonable jury could make where the lower court fails to adequately "identify the particular charged conduct that it deemed adequately supported by the record." *Lewis*, 604 F.3d at 1225. Second, "when the 'version of events' the district court holds a reasonable jury could credit 'is blatantly contradicted by the record,' [this Court] may assess the case based on [its] own *de novo* view of which facts a reasonable jury could accept as true." *Id.*, 604 F.3d 1225-26, *citing Scott v. Harris*, 550 U.S. 372, 380 (2007).

## II.   The District Court Erred When Determining Plaintiff Satisfied The McDonnell Douglas Burden-Shifting Framework In Raising Material Fact Issues Sufficient To Avoid Summary Judgment On Her §1983 Claims Against Commissioner Powell

A.   Summary Judgment Standards in the Qualified Immunity Context.

22

Once a party, moving for summary judgment under Fed.R.Civ.P. 56, has established a *prima facie* case for the relief sought, the non-moving party must bring forth evidence admissible at trial sufficient to create genuine and material issues for a jury. *Thomas v. International Business Machines,* 48 F.3d 478, 485 (10th Cir. 1995). In part, this means summary judgment cannot be opposed based on mere speculation or hearsay. *Truck Insurance Exchange v. MagneTek, Inc.*, 360 F.3d 1206, 1216 (10th Cir. 2004). Rather, the nonmoving party must come forth with evidence sufficient for a factfinder to find in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251 (1986). To constitute a finding of a "genuine" factual dispute, "there must be more than a mere scintilla of evidence . . . summary judgment may be granted if the [opposing] evidence is merely colorable or is not significantly probative." *Vitkus v. Beatrice Company,* 11 F.3d 1535, 1539 (10th Cir. 1994). Stated another way, only factual disputes which "might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248.

Resolving summary judgment issues in the context of assertions of qualified immunity requires special consideration because qualified immunity inherently is often a fact based inquiry. When, in a §1983 case, a defendant asserts qualified immunity, "the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right, and (2) the constitutional right was clearly established."

23

*Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). To establish a violation of a constitutional right, where there is no direct evidence of discrimination sufficient to survive summary judgment, plaintiff must satisfy the three step framework under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973). Plaintiff must show a *prima facie* case for retaliatory discrimination which, in this case, requires a showing: (1) Walton engaged in a protected activity; (2) a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection existed between the protected activity and the materially adverse action. *Argo v. Blue Cross Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006). This Court has stated that the required causal connection may be shown by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Hart v. Dillon Companies, Inc.*, 2014 W.L. 6819724, at *9 (D. Colo. 2014), *citing McGarry v. Board of County Commissioners of County of Pitkin,* 175 F.3d 1193, 1201 (10th Cir. 1999). For claims involving discrimination on grounds of political association, the plaintiff must establish sufficient evidence to demonstrate her association was political in nature. *Barry v. Moran*, 661 F.3d 696, 704 (1st Cir. 2011) ("The First Amendment invests public employees with certain rights, it does not empower them to constitutionalize the employee grievance," *citing Garcetti v. Ceballos,* 547 U.S. 410, 420 (2006)). Accordingly, "mere personal association without political overtones does not

24

implicate First Amendment concerns, and the burden of proof is on the plaintiff to demonstrate that her association was political and not personal." *Barry,* 661 F.3d at 704. Plaintiff must also show the protected political association was a substantial or motivating factor for the adverse employment action. *Brown v. Reardon,* 770 F.2d 896, 899 (10th Cir. 1985). Once the plaintiff establishes a *prima facie* case for discrimination, the burden shifts to the defendant to show a legitimate, non-retaliatory basis for his action. *Id.* If defendant meets this burden, the plaintiff then must offer evidence to show the retaliation was a determinative factor in the employment decision or that the defendant's non-retaliatory proffer was merely a pretext for discriminatory behavior. *McGarry,* 175 F.3d at 1202-03.

In determining whether plaintiff has met her burden in establishing a *prima facie* case for discrimination, the Court construes the facts in a light most favorable to the nonmoving party. *Thomson v. Salt Lake County,* 584 F.3d 1304, 1312 (10th Cir. 2009). Nonetheless, plaintiff's version of the facts sufficient to support a denial of summary judgment on grounds of qualified immunity must find strict support in the record. "The objective is not to determine whether a plaintiff survives summary judgment because plaintiff's evidence raises material issues that warrant resolution by a jury. Instead, the principle purpose is to determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the

legal question before the Court." *Id.* at 1326. In the event Plaintiff does not carry her burden of proof of establishing a claim for retaliation on the basis of her political association with the Lyons Administration under the *McDonnell Douglas* framework, summary judgment must be granted Commissioner Powell.

Even if Plaintiff satisfies the *McDonnell Douglas* framework in establishing sufficient evidence to show retaliatory discrimination, she still must satisfy the objective reasonableness test of the qualified immunity analysis. Under qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Douglas v. Dobbs,* 419 F.3d 1097, 1100 (10th Cir. 2005). The burden is on the plaintiff to show the defendant is not entitled to qualified immunity. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

> B.    Walton does not have a Constitutionally Protected Interest in Any Political Association with the Lyons Administration.

The First Amendment protects a public employee from an adverse employment action based on purely political reasons, such as a political association with a particular party, idea or administration, unless the party affiliation is a necessary requirement for the position. *Elrod v. Burns,* 427 U.S. 347, 359 (1976). Commissioner Powell acknowledges party affiliation was not required for Walton to hold her GM I position. The interest protected involves the right to be free of

26

retaliation for one's political beliefs and associations which "constitute the core of those activities protected by the First Amendment." *Id.* at 356. It is the "freedom to associate with others for the common advancement of political beliefs and ideas" which is protected by the First and Fourteenth Amendments. *Id.* at 357. These protections are grounded in our "profound national commitment to the principle that the debate on public issues should be uninhibited, robust and wide open." *Id., citing New York Times Co. v. Sullivan,* 376 U.S. 254, 270 (1964).

However, "not every association of a public employee can support a § 1983 claim." *Wrobel v. County of Erie,* 692 F.3d 22, 28 (2nd Cir. 2012). A public employee has protection only where that association is political in nature such that it is a matter of public concern. *Klug v. Chicago School Reform Board of Trustees,* 197 F.3d 853, 857 (7th Cir. 1999). It must implicate a constitutional concern. *Barry v. Moran,* 661 F.3d 696, 704 (1st Cir. 2011). The First Circuit describes this interest as follows:

> Nevertheless, it is clear that, in constitutional terms, freedom of association is not to be defined unreservedly. Entry into the constitutional orbit requires more than a mere relationship . . . The First Amendment does not protect against all deprivations arising out of an act of association unless the act itself - say joining a church or a political party, speaking out on matters of public interests, advocacy or reform - falls within the scope of activities eligible for inclusion within the constitutional tent.

*Correa-Martinez v. Arrillaga-Belendez,* 903 F.2d 49, 57 (1st Cir. 1990).

27

Cases falling "within the constitutional tent" require some proof that the protected association is political in nature. *See Bass v. Richards,* 308 F.3d 1081 (10th Cir. 2002) (plaintiff suffered an adverse employment action because his political alignment and belief were at odds with his employer); *Jantzen v. Hawkins,* 188 F.3d 1247 (10th Cir. 1999) (plaintiffs' association claims were protected where they campaigned against incumbent sheriff in election); *Mason v. Oklahoma Turnpike Authority,* 115 F.3d 1442 (10th Cir. 1997) (plaintiff was dismissed because he refused to hire a political supporter of the new managing director of the Oklahoma Turnpike Authority). On the other hand, political association claims do not survive summary judgment where there is no showing of any adverse employment action which was in retaliation for one's political belief. For example, where one is retaliated against merely because of an association with a person or administration, no First Amendment claim is recognized. *Busey v. County of Shawnee, Kansas,* 277 F.Supp.2d 1095 (D. Kansas 2003); *see also, Garrett v. Barnes,* 961 F.3d 629 (7th Cir. 1991) (mere knowledge by employer of plaintiff's opposite party status is insufficient to state constitutional claim).

In the present case, the district court found Walton made a *prima facie* case for discrimination because of her political association with the Lyons Administration. Notably, Judge Browning rejected any claims based on Walton's Republican Party status (Aplt. App. 553-54), although the law is clear that mere

28

knowledge by an employer that an employee is a member of the opposite party does not support a political association claim. Even so, there is no evidence showing that Commissioner Powell, a Democrat, knew Walton was a Republican. A review of the record makes clear there is insufficient support for a claim that Walton's association with the Lyons Administration was political in nature. Specifically, there is no evidence Walton expressed any political ideas, ideology, or advocated political goals contrary to those espoused by the Powell Administration. Certainly, there is no showing the Commissioner was aware of any political views of Walton. There is no evidence Walton campaigned against Commissioner Powell during the 2010 general election. There is no evidence Commissioner Powell knew Walton supported his opponent, Matthew Rush, in that election. The evidence shows only that Commissioner Powell had some awareness that Walton worked in the Lyons Administration, yet many others in his own administration, including his HR Director, Lopez, were also holdovers from the prior administration and there is no evidence other such employees suffered any adverse employment action. The evidence is clear that Commissioner Powell knew that Walton was the subject of certain claims by investigative reporter Barker that she held positions for which she was allegedly unqualified, a belief not held by the Commissioner or his HR Director, Lopez. Even assuming one could find support in the record to conclude Walton was one of Lyons' "protected employees" or a beneficiary of cronyism in her original

29

hire and reclassifications, there is nothing associating Walton to any particular political loyalty adverse to the interests of Commissioner Powell or his administration. Stated otherwise, how is it that holding classified positions for which one is allegedly not qualified or advancing the interests of cronyism constitutionally protected?

Because Walton has not established a constitutionally protected association with the Lyons Administration which was political in nature, her claim must fail as not coming within the "constitutional tent." Her association with the Lyons Administration, at least to the extent known by Commissioner Powell, does not rise to a matter of public interest or concern sufficient to bring a § 1983 claim and the district court erred in determining otherwise.

> C. Plaintiff Failed to Establish a *Prima Facie* Case Sufficient for a Reasonable Jury to Conclude that Commissioner Powell Violated her Constitutional Right not to be the Subject of a Reduction in Force as a Result of any Political Affiliation with the Lyons Administration.

The district court determined Walton produced sufficient evidence to establish a *prima facie* case for a violation of her First and Fourteenth Amendment rights to political affiliation with the Lyons Administration. The record, however, does not support this finding. There is no evidence, for example, that Commissioner Powell knew Walton was a member of the Republican Party, or that she held any particular political belief adverse to his interests, when approving the RIF designed by Olah.

The record does reflect that Commissioner Powell knew that Walton was an employee of NMSLO during the Lyons Administration and had knowledge of her original hire and subsequent transfer and job reclassification through viewing the Larry Barker report and the letter he received from attorney Hemphill on January 27, 2011. Although Commissioner Powell learned that Barker believed Walton was not qualified for her classified position, a position alleged by Barker as obtained through "cronyism," this undisputedly was not the view of the Powell Administration. Lopez, the NMSLO's HR Director under both administrations, never took the position Walton was unqualified for any position nor is there any evidence Commissioner Powell specifically believed Walton was a beneficiary of "cronyism."

Walton's affidavit notwithstanding, wherein she claims the reclassification requested by Lyons bypassed HR approval, Lopez approved Walton's transfer and reclassification into her Economist A and GM I positions, due to experience "equivalencies." The district court relies on the minutes of the State Land Trust Advisory Board meeting of April 14, 2011, specifically noting the comments of the Commissioner that "there had been a series of interviews by investigative reporters like Larry Barker which had been featured on television statewide." Several lines down, and clearly in a different context, the minutes state that "Commissioner Powell was concerned about employees in inappropriate roles, 'protected

31

employees.' These employees for some reason didn't have to meet the leadership criteria within the divisions, and somehow got directions from the front office." For several reasons, the lower court's findings are legally insufficient to support Walton's *prima facie* case and it unduly speculates that these ambiguous statements somehow are a direct reference by Commissioner Powell to Walton's claimed protected political association with Commissioner Lyons. First, there is no clear link between the statements without engaging in gross speculation as to what Commissioner Powell meant. Second, Commissioner Powell, in his deposition, testified he was referring to individuals other than Walton in discussing the concept of "protected employees." Third, there is no support in the record for the district court's conclusion that Walton's circumstances were "accurately described" by Commissioner Powell's reference of "protected employees" as those who, under Lyons, "got directions from the front office. . . ." Although these statements are clearly ambiguous, even if interpreted by the lower court to mean Walton was reclassified at the fiat of Commissioner Lyons without proceeding through proper channels, the record supports the opposite finding. Lopez, in her deposition, specifically stated that she was instructed by Commissioner Lyons to transfer Walton from an Economist A to GM I position. Lopez consistently testified that although Walton indeed did not qualify for the GM I job on her education history, she did qualify due to her experience. Moreover, the PADF document necessary to

approve the reclassification was approved by Lopez, after which she forwarded the personnel changes to SPO for final approval. There is no record support for Walton's assertion that she bypassed Lopez or "the normal chain of command" to achieve job reclassification. It is ironic that Walton, who clearly was upset by the Barker report and accusations of "cronyism," as evidenced by the lengths to which she attempted to convince Commissioner Powell otherwise through her phone call to him just prior to the Barker story airing and the January 27 letter she had her lawyer, Hemphill, send him, now seems to embrace the same allegations to the extent it advances her case in this lawsuit.

To survive summary judgment, Walton must establish that Powell approved the RIF of her GM I position and that her political association with the Lyons Administration was a substantial motivating factor for the decision. The Tenth Circuit has developed standards for determining the evidentiary showing sufficient to meet this burden. In *Benton v. Adams County Board of County Commissioners,* 303 Fed.Appx. 625 (10th Cir. 2008), plaintiff was terminated five months after she refused the county treasurer's request to speak to the state general assembly regarding a bill he supported. Plaintiff claimed this refusal resulted in a five month pattern of escalating retaliatory conduct from the defendant, primarily in the form of harassing behavior such as refusing to say good morning and the like, leading up to the adverse employment action. Defendant asserted plaintiff's position was

terminated because "her position was unnecessary." *Id.* at 626. This Court

established the burden necessary for plaintiff to carry a *prima facie* case forward on

political association discrimination by stating:

> What constitutes a substantial motivating factor evades precise definition. An employee need not prove his speech was the sole reason for the defendant's action. Nor is the employee required to show "but for" causation; that is, to demonstrate but for the employee's speech the subsequent employment action would not have occurred. Rather, the employee must show the protected speech played a substantial part in the employer's decision to adversely alter the employee's conditions of employment.
>
> * * *
>
> To withstand summary judgment . . . an employee must produce evidence linking the employer's action to the employee's [protected activity]. Speculation or hunches amidst rumor and innuendo will not suffice. Nor can a plaintiff sustain his burden . . . simply by showing that the elimination of the protected activity may have been welcomed by the defendants.

*Id.* at 628.

The Court in *Benton, citing Maestas v. Segura,* 416 F.3d 1182, 1188-89 (10th

Cir. 2005), further emphasized:

> An employer's knowledge of the protected [activity], together with close temporal proximity between the speech and challenged action, may be sufficiently probative of causation to withstand summary judgment. Other evidence of causation may include evidence the employer expressed opposition to the employee's [activity], or evidence the [activity] implicated the employer in serious misconduct or wrongdoing. On the other hand, evidence such as a long delay between the employee's speech and challenged conduct, or evidence of intervening events, tends to undermine any inference of retaliatory motive and weakens the causal link.

*Id.* at 629.

In *Benton*, this Court concluded that plaintiff failed to present sufficient evidence linking her termination with the claimed protected activity on what appears to be two grounds. First, the five month gap between these two actions was insufficient to show the necessary "close temporal proximity" necessary to establish causation. This Court has previously held that a three month gap between the protected activity and adverse employment action, standing alone, does not establish a causal connection sufficient for a showing of a *prima facie* case. *See Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997). Second, the Court found that claimed instances of retaliatory conduct on the part of the defendant in the interim were too speculative to associate with discriminatory animus on the defendant's part.

Here, the district court erred in finding Walton established a *prima facie* case for political association discrimination. Walton argues that Powell's knowledge of her association with the Lyons Administration, coupled with her job history as an exempt hire followed with a transfer into an Economist A and reclassification to GM I, knowledge of the Barker report asserting Plaintiff was unqualified for prior jobs obtained through cronyism, in addition to Powell's "glaring" at Walton when making statements about "protected employees" in a meeting, are sufficient to take this case forward to a jury. The lower court consistently overlooks the fact Commissioner Powell neither designed nor had any input into the RIF plan. He only approved Olah's recommendations as to which position would be eliminated. Olah,

35

moreover, did not know Walton nor was Olah aware of Walton's job history or the contents of the Barker report. The record is devoid of any evidence of discriminatory animus against Walton either on Olah's part or from Commissioner Powell in the form of input or oversight into the RIF process. When the Commissioner took office in January 2011, he had all the knowledge necessary, as identified by the lower court, to motivate him to take adverse action against Walton on protected grounds, if that was his intent. He viewed the Barker report in November 2010 and received the Hemphill letter a few weeks after taking office. Yet, he did not approve, nor did he know of, the RIF recommendations until April 6, 2011. Moreover, during the interim period of time both Commissioner Powell and Olah attempted to save the agency from any RIF, and consequently Walton's position, through their efforts to convince the Legislature that the reduction of two FTEs along with the $609,000.00 in associated budget cuts was detrimental to the agency and should be reconsidered. In his opinion in *Benton*, Judge Holmes, considering a similar issue, and referencing the five month gap between the protected activity and termination, asked why, if the state treasurer was so angry at the plaintiff's refusal to testify on a bill before the general assembly, he would give her a raise two months after that activity. *Benton*, 303 Fed.Appx. at 630. There is no difference in principle between the circumstances in *Benton* and the case at bar. Why would Commissioner Powell, after learning of the Barker report of Walton's supposed cronyism and having received the Hemphill

letter, fight to keep her job? Further, all facts raised by the district court in its MOO supporting a *prima facie* case have little to do with protected rights of political association. Facts such as Commissioner Powell supposedly "making faces" at Walton or even his discussion about "protected employees" have nothing to do with political activity on Walton's part. At the very least, such acts are far too ambiguous to imply a causal link between constitutionally protected activity by Walton and the decision by the Commissioner to approve Olah's RIF plan. Only outright speculation can possibly make this link.

Case authorities cited by the district court in support of its determination that Plaintiff made a *prima facie* showing of discrimination for her political association with the Lyons Administration are inapposite to the case at bar. The lower court, for example, cites *Durant v. Ind. Sch. Dist. No. 16, of LeFlore Cnty., State of Oklahoma*, 990 F.2d 560, 564 (10th Cir. 1993), for the undisputed principle that "allegations of retaliation are often supported only by circumstantial evidence." There, plaintiff actively campaigned for defendant's opponent in a school board election before she was terminated following the election. Importantly, during the election process she was warned to "stay out of politics and threatened . . . with termination if she persisted." *Id.* at 562. Under these circumstances, it is not surprising the trial court denied defendant's motion for directed verdict on the First Amendment claim.

The district court also cites *Gann v. Cline,* 519 F.3d 1090 (10th Cir. 2008).

There, the Court found plaintiff's political non-affiliation with defendant, alleged to have been the motivating factor for the loss of her job to another who actively supported the official in an election, was protected under the First Amendment. It is significant that *Gann* was decided under a motion to dismiss under Fed.R.Civ.P. 12(b)(6), not one for summary judgment. Moreover, the defense acknowledges that the allegation plaintiff was terminated because she did not support a particular candidate, if true, would clearly be unlawful. Those are not the circumstances in the case at bar. Under the summary judgment standards in the context of Plaintiff's burden of proving Commissioner Powell is not entitled to qualified immunity, the record in this case does not support a First Amendment claim.

> D. Assuming Walton Establishes a *Prima Facie* Case for Discrimination on the Grounds of Political Association, Powell set Forth Legitimate, Non-Discriminatory Reasons for the RIF of her GM I Position.

The district court noted that the RIF was legislatively mandated and that Commissioner Powell approved a RIF design carried out and recommended to him by Elaine Olah, his Assistant Commissioner for Administrative Services. The district court correctly noted that Olah was unaware of Walton's affiliation with Commissioner Lyons when designing the RIF, that she considered the structure and mission of the NMSLO in the course of her work, that she chose Walton's position because there were two GM I positions in the CR Division, a situation she described

38

as an "anomaly," and she did not choose only vacant positions because "of a desire to cut the Land Office budget as well as meet the Appropriation Acts requirement of cutting two FTE positions." With this undisputed evidence, the district court had little difficulty finding Commissioner Powell established his burden under the *McDonnell Douglas* framework for setting forth legitimate, non-discriminatory reasons for the RIF of Walton's position.

Nonetheless, the district court ignored undisputed evidence in the record that it was more than just a "desire" to cut the NMSLO budget on the part of Olah in choosing one filled FTE for the RIF. She was, in fact, mandated to reduce not only the total number of FTE's from 153 to 151 but also to reduce the agency budget by $609,000.00. The only way to do this was through the elimination of at least one active FTE position which brought the agency within the legal mandate.

It cannot be contested that Commissioner Powell satisfied his burden of showing a legitimate, non-discriminatory reason for the RIF of Plaintiff's GM I position. This burden is established once the defendant sets forth reasons for the adverse employment action impacting plaintiff in a legally sufficient manner to justify judgment for the defendant. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 255 (1981). Olah explained the reasons why the GM I position held by Plaintiff was the subject of the RIF of the one active, filled FTE. The evidence is also undisputed that Commissioner Powell and Olah fought hard to recapture the

39

two FTE's and budget cuts which were originally proposed by Commissioner Lyons. The Governor's mandates were achieved only through the RIF of a filled FTE, chosen as Plaintiff's GM I position by Olah exercising her discretion to serve the best interests of the agency. The specific GM I position held by Walton was chosen for the RIF based on her lack of seniority, as between the holders of the respective GM I jobs, as per state personnel rules.

The Supreme Court in *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 76 (1990), noted that "the First Amendment is not a tenure provision, protecting public employees from actual or constructive discharge." Importantly, the courts should not be in a position to second guess legitimate business or organizational decisions of employers, particularly in the context of a RIF, which both Olah and Powell were charged to carry out. *Id.*

> E.   The District Court Erred in Determining that Walton Produced Sufficient Evidence for a Jury to Conclude that Commissioner Powell's Proffered Reasons for the RIF of her GM I Position were Pretextual.

The third prong of the *McDonnell Douglas* test shifts the burden, following the employer's establishment of a reasonable non-discriminatory reason for the adverse employment action, back to the Plaintiff to prove the stated reasons were pretextual. Distinct from the burden of establishing a *prima facie* case, which is not onerous, Plaintiff's burden here is more demanding and requires proof "satisfying the normal burden of any plaintiff to prove . . . her case at trial." *EEOC v. Flasher*

*Company, Inc.,* 986 F.2d 1312, 1316 (10th Cir. 1992). "A plaintiff can establish pretext by showing the defendants proffered non-discriminatory explanations for its actions are so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [they are] unworthy of belief." *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1038-39 (10th Cir. 2011), *citing Johnson v. Weld County, Colorado*, 594 F.3d 1202, 1211 (10th Cir. 2010). Plaintiff cannot survive summary judgment unless she both discredits the employer's proffered reason and demonstrates the "circumstances permit a reasonable inference of discriminatory animus." *Gibson v. Am. Greetings Corp.,* 670 F.3d 844, 856 (8th Cir. 2012), *citing Haigh v. Gelita USA, Inc.,* 632 F.3d 464, 470 (8th Cir. 2011). In determining whether the defendant's proffered reasons are pretextual, the focus is on the stated reasons for the adverse employment action based on facts as they subjectively appear to the decision maker. The plaintiff's subjective evaluation of the reasons for the termination are immaterial. *See C.R. England,* 644 F.3d at 1044.

Of course, the evidence supporting a claim of pretext must not involve speculation or conjecture. *Johnson v. Securitas Security Services USA, Inc.,* 769 F.3d 606, 612 (8th Cir. 2014). Although a showing of pretext does not require the plaintiff to come forth with direct evidence of actual discrimination, plaintiff must show that a rational trier of fact could not find the reason worthy of belief. *Timmerman v. U.S. Bank, N.A.,* 483 F.3d 1106, 1113 (10th Cir. 2007).

41

In determining whether plaintiff satisfies her burden, courts look heavily to the temporal proximity between the claimed protected activity and adverse employment action. The close temporal proximity present for purposes of establishing a *prima facie* case may not be sufficient to survive summary judgment on the issue of pretext because the evidentiary burden is different. *Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1180 (10th Cir. 1999). This Court has held that a three month lapse between the protected activity and adverse employment action is insufficient for proving a causal link. *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir. 1997).

*Gilkey v. Siemens Energy and Automation, Inc.,* 125 Fed.Appx. 908 (10th Cir. 2005), provides an instructive analysis of the *McDonnell Douglas* formula focusing on plaintiff's claim of pretext in a reduction in force context. There, plaintiff claimed he was chosen for a RIF because of racial discrimination in a Title VII case. This Court stated that pretext could be shown by, among other methods, establishing "that: (1) his termination was not in accordance with the RIF criteria allegedly used; (2) his evaluation under the RIF criteria was falsified or manipulated; or (3) the RIF itself was pretextual and the employer was not really reducing its workforce." *Id.* at 911. Importantly, the Court noted that "[an employer] may choose to conduct its RIF according to its preferred criteria of performance . . . and we will not disturb that exercise of defendant's business judgment." *Id., citing Beard v. Seagate Tech,*

42

*Inc.,* 145 F.3d 1159, 1169 (10th Cir. 1998). Stated otherwise, "this Court will not second guess business decisions made by employers, in the absence of some evidence of impermissible motives." *Gilkey,* 125 Fed.Appx. at 911, *citing Lucas v. Dover Corp.,* 857 F.2d 1397, 1403-04 (10th Cir. 1998).

Here, Walton has not demonstrated legally sufficient evidence of pretext to avoid summary judgment. The district court cited four primary reasons why Walton satisfied her heavy burden, none of which collectively or singularly are sufficient. First, it noted that Commissioner Powell sent an electronic email to all NMSLO employees after terminating Walton's employment, which, according to her affidavit, she "had never been seen in her almost 30 years working in state government." Walton fails to explain that neither she nor Commissioner Powell had ever experienced a similar legislatively mandated RIF. For his part, the Commissioner testified that the email, which explained to the employees the reasons for the RIF, describing the decision as "difficult," was intended to assure them that their jobs were not in jeopardy and to prevent what he described as a "generalized panic that people were going to lose their jobs." He also explained that he wanted to send a message to agency employees that Walton's separation was the product of thoughtful analysis and not to put Walton in a bad light. This email, under any reasonable reading, does not support an inference of discriminatory animus on the part of Commissioner Powell against Walton. Second, the court below cites to the

New Mexico Administrative Code (NMAC) for the proposition that there were two vacant positions available when Walton's position was terminated but she was not offered either position. There is no evidence in the record to support this finding as a basis for establishing pretext. HR Director Lopez explained that Walton's right of refusal under NMAC existed from the time of Walton's separation only until July 1, 2011. During that time, however, NMSLO was not filling any positions. There were, in fact, no positions within the agency to offer Walton.

Third, the district court states that while Walton's CR Division had the two GM I positions, described by Olah as an "anomaly," other divisions within the agency did as well. Specifically, the Court relied on evidence that the Oil, Gas, and Minerals Division also had two GM I positions in its organizational structure. However, Olah described in detail the differences between the two divisions and why one situation caused organizational concerns and the other did not. The CR Division, which comprised Walton's position, was far different in size and scope than the Oil, Gas, and Minerals Division. The latter, for example, brought in over \$500 million annually to the agency compared to \$6 million by the CR Division. Moreover, Olah described the specific problem with the two GM I positions in the CR Division where one position supervised a number of employees whereas the other position supervised none. She described that due to the differences in the "scope of the responsibilities and the size of the staff," Oil, Gas, and Minerals

warranted two GM I positions, whereas the CR Division did not. In identifying this as evidence of pretext, the Court below ignores the right of the employer to design a RIF in accordance with its interpretation of organizational needs, and the rightful exercise of proper business judgment. *Gilkey v. Siemens Engineering and Automation, Inc.*, 125 Fed.Appx. at 908 (10th Cir. 2005).

Finally, the district court asserts the requirements of the legislative mandate could have been accomplished by terminating two vacant and unfilled positions, leaving intact Walton's GM I position. Again, Olah specifically addressed this issue by noting that at least one filled position was required to be eliminated in order to meet the necessary budgetary reduction by $609,000.00. Olah explained that as a result of the RIF of the one filled position, the General Appropriations Act requirements were met and the agency was able to show a surplus of $70,000.00 as opposed to a deficit of $95,000.00.

The district court cites, in particular, the case of *Laidley v. McClain*, 914 F.2d 1386 (10th Cir. 1990), in support of its determination that Walton's pretext burden has been satisfied. This reliance is misplaced. *Laidley* was a §1983 claim alleging political association discrimination after plaintiffs were terminated from the district attorney's office because of their support for the defendant's opponent in a primary election. This Court reversed summary judgment for the defense finding issues of material fact whether that support was a substantial or motivating factor in the

decision to discharge. The facts in *Laidley* are inapposite from the case at bar. There, the plaintiff actively campaigned for the new DA's opponent. There is no evidence in the record here that Walton campaigned against Commissioner Powell or, at least, that he was aware of those activities. The defendant in *Laidley* claimed non-political reasons for plaintiff's termination, specifically that her job was eliminated as part of a cost cutting drive where, in fact, there was little support for that assertion. The new D.A. (McClain), in contrast to Commissioner Powell's participation, had personal control over what particular positions would be funded or staffed and apparently had direct control over the termination of plaintiff's position. The Court found this raised legitimate questions as to whether the defendant used budget as a pretext for dismissing her. Commissioner Powell, on the other hand, only formally approved the RIF designed by Olah which, in turn, was based only on her own evaluation of the organizational structure of NMSLO in an effort to come within the mandate of the General Appropriations Act. The record is devoid of any evidence of control or oversight of this process by the Commissioner. Moreover in *Laidley,* there is evidence that the Department of Human Services (DHS), which provided funding for the DA's office, suggested to McClain that he could use part-time attorney work, thereby at least partially saving plaintiff's job as an assistant district attorney. Instead, the defendant decided to terminate plaintiff's position in its entirety. The Court noted that McClain, when informing plaintiff of

46

the reasons for her dismissal, was not truthful and blamed DHS for the circumstances where he, in fact, made that decision himself. McClain falsified his reasons for the job termination by citing a lack of funds as the reason for plaintiff's dismissal where, in fact, it was undisputed that there were sufficient funds to retain her. Finally, there was a temporal nexus to the adverse employment action, as McClain terminated plaintiff's job immediately upon taking office, presumably right after the election. Commissioner Powell, on the other hand, approved Olah's RIF design over three months into the Powell administration and only after significant efforts were undertaken by both Powell and Olah to recapture the two lost FTEs and budget reduction. The April 6, 2011, approval in fact came almost four and a half months after the Commissioner learned of Walton's supposed "cronyism" during the airing of the Barker report. Finding the absence of any legitimate motive for plaintiff's termination, the Court in *Laidley* determined that it was more likely that other motives such as political patronage were behind the decision to fire the plaintiff, particularly when McClain terminated other personnel who opposed him in the election but retained his own people.

There is no reasonable comparison of the facts on the issue of pretext between the *Laidley* case and Walton's claims. This Court, evaluating another patronage dismissal case in *Six v. Henry,* 42 F.3d 582 (10th Cir. 1994), upheld defendant's dismissals of certain lower level employees in the Office of the Oklahoma State

Treasurer after a change of administration. There, the defendant testified that she simply could give no specific reason for the terminations of individuals who served her predecessor in office. The Court distinguished the *Laidley* case explaining that the district attorney who discharged the plaintiff gave at least two reasons for the firing which the Court charitably characterized as "not entirely accurate." *Id.* at 584, *citing Laidley*, 914 F.2d at 1393. Here, Walton can demonstrate no false or inconsistent statements of either Olah or Commissioner Powell in the design and approval of the RIF. Walton has shown no evidence that Olah or Commissioner Powell utilized improper RIF criteria or manipulated it in a manner targeting Walton. Of course, to begin with, the RIF was not the idea of Commissioner Powell, but was imposed on him by not only Governor Martinez, but Commissioner Lyons himself. Walton and the district court also wholly ignore that there is no evidence that Commissioner Powell terminated other employees who worked under or were associated with the Lyons Administration.

Walton's evidence of pretext does not meet her heavy burden. At best, the evidence relied on by the court below to infer any discriminatory animus on the part of Commissioner Powell is speculative. At worst, there is no evidence in the record to support any showing of discriminatory animus. A finding of pretext sufficient to go to a jury here risks creating precedent that all adverse employment action impacting employees who are members of the opposing political party or who

48

worked for the defendant's predecessor rises to the level of constitutional review. This Court has the authority to find grounds supporting a grant of summary judgment even where there is direct evidence of retaliation which, in the context of the whole record, is weak. *EEOC v. Picture People,* 684 F.3d 981, 991 (10th Cir. 2012); *see also, Jackson v. NTMEDIA, LLC,* 199 Fed.Appx. 653, 664 (10th Cir. 2006) (Employer entitled to judgment as a matter of law where record conclusively reveals a non-discriminatory reason for the termination in the face of weak fact issues supporting pretext). To find Walton satisfied her heavy burden of proving pretext, this Court must be convinced Commissioner Powell's proffer of a legitimate, non-discriminatory reason for approving Olah's RIF design was "so incoherent, weak, inconsistent or contradictory that a rational factfinder could conclude they are unworthy of belief." *C.R. England,* 644 F.3d at 1038-39. Under any reasonable whole record review, this burden is not carried. Summary judgment should have been granted to Commissioner Powell.

## III. Commissioner Powell's Decision To Approve The RIF Designed By Olah Was Objectively Reasonable Under The Circumstances And He Is Entitled To Qualified Immunity.

Under the second prong of the two part test for evaluating a qualified immunity defense, Plaintiff must show that the law governing Commissioner Powell's conduct was clearly established at the time he approved the RIF designed by Olah. *Meneley v. Shawnee County*, 379 F.3d 949, 954 (10th Cir. 2004). For a

right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). The relevant question in this case is whether, given the law on discrimination under the First Amendment for political association and the information possessed by Commissioner Powell at all relevant times, all other similarly situated reasonable officials should have declined approval of the Olah RIF design. *See Saucier v. Katz,* 533 U.S. 194, 202 (2001) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.") Under this test of objective reasonableness, defendant's subjective knowledge of the constitutionality of his conduct is completely irrelevant. *Crawford-El v. Britton*, 523 U.S. 574, 574-75 (1998). Thus, even if Commissioner Powell is found to have violated a clearly established right of Walton, he is nonetheless entitled to qualified immunity if his conduct was objectively reasonable. Plaintiff's burden is a heavy one to show, by analogous Tenth Circuit, U. S. Supreme Court, or the weight of authority from other courts, that under the circumstances presented to Commissioner Powell, the unlawful nature of his action was apparent to him. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *see also, Gonzales v. City of Elgin,* 578 F.3d 526, 540 (7th Cir. 2009) (because "the purpose of qualified immunity is to protect public officials from guessing about

constitutional developments at their peril, the plaintiffs have [the burden of proof]. .

. ."). Here, Defendant is entitled to summary judgment if he demonstrates that any

reasonable official in his position would believe his conduct in approving the RIF

was lawful. *Ashcroft v. Al-Kidd,* 131 S.Ct. 2074, 2083 (2011) (officials are entitled

to qualified immunity when not only the contours of a right are sufficiently clear,

but that every "reasonable official would have understood that what he is doing

violates that right").

Qualified immunity "provides ample protection to all but the plainly

incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S.

335, 341 (1986). The Supreme Court in *Harlow v. Fitzgerald,* 457 U.S. 800 (1982)

intended an objective test of legal reasonableness in determining whether a public

official such as Commissioner Powell is entitled to qualified immunity. This test

was designed to eliminate such subjective factors as the official's "permissible

intentions" or "good faith belief." The Court intended a procedural means which

would "permit the resolution of many insubstantial claims on summary judgment."

*Id.* at 818. In requiring plaintiff to meet this heavy two-part burden to successfully

oppose qualified immunity, the Court was concerned about public officials diverting

official energy from pressing public issues, the deterrence of citizens from accepting

public office and, moreover, imposing a "chilling" effect on public officials in the

discharge of their discretionary duties. *Id.* at 814. Under no reasonable view of the

facts in the present case can the Court state that every public official in Commissioner Powell's position would have believed he was violating clearly established law.

The circumstances facing Commissioner Powell at the time he was presented with Olah's RIF design on April 6, 2011, are clear. He was legislatively mandated to reduce agency-wide FTEs from 153 to 151 and further reduce the budget by $609,000.00, despite efforts he and Olah made to recapture the FTE and budget losses. Further, Commissioner Powell heard recommendations from Olah as to her agency wide investigation and decision she was tasked with for the NMSLO to meet that legislative mandate. He was told that the agency was required to terminate one filled position in order to meet budgetary requirements and that Olah determined the best course was to terminate one of two GM I positions in the CR Division because of an organizational anomaly. Ultimately, it was determined that the GM I position to be eliminated was that occupied by Walton; this determination was based solely on state personnel rules regarding seniority. In doing so, Commissioner Powell, who had not been active in the process or oversight of the RIF design, was aware Walton was employed by the NMSLO during the Lyons Administration, having been initially hired into an exempt position and later transferred and reclassified into positions protected under state personnel rules. He was also aware, through the Barker report and Hemphill letter, that Walton was alleged to be unqualified for at

52

least one of these jobs, with the suggestion that she obtained and held her positions during the Lyons Administration due to cronyism. Nonetheless, Commissioner Powell's own HR Director approved Walton's personnel changes and did not believe Walton was unqualified for any position she held within the agency. There is no evidence Commissioner Powell was aware Walton was a member of the Republican Party, campaigned against him, or that she claimed political allegiance to beliefs, issues or positions adverse to the Powell administration. Commissioner Powell was aware he had been highly critical, in many respects, of former Commissioner Lyons with respect to certain policies and various wrongdoings during that administration, such as that disclosed through an audit by the State Auditor, sufficient to suggest a referral to authorities for potential prosecution. Finally, Commissioner Powell was aware of his concerns about those he identified as "protected employees" or those who "didn't have to meet the leadership criteria within the divisions, and somehow got directions from the front office," although there is nothing in the record beyond pure speculation to suggest he meant this applied to Walton or that it implicated her in any political sense.

Given his state of knowledge at the time he approved the Olah RIF design, Commissioner Powell is entitled to qualified immunity. Simply, Walton has not met her burden of an objective showing that every reasonable public official in the Commissioner's situation as of April 6, 2011, when presented with the decision

whether or not to approve Olah's RIF plan, would have believed that his act violated clearly established rights or that he was retaliating against Walton based on some form of political association with the Lyons Administration.

## CONCLUSION

The district court erred in denying Commissioner Powell summary judgment on qualified immunity grounds for several reasons. First, Walton, under the undisputed facts of this case, has not demonstrated a constitutionally protected interest in any political association with the Lyons Administration. Although there is insufficient evidence to show Commissioner Powell retaliated against Walton on any basis, even if it were assumed that he targeted the RIF to Walton's GM I position on the basis that she was unqualified for her positions or had been the beneficiary of Lyons' cronyism, Walton's claims do not rise to the level of constitutional protection because such "association" is not political in nature.

Walton has not satisfied her burden of showing a *prima facie* case for discrimination under the First Amendment utilizing the *McDonnell Douglas* three step framework. Even assuming she carried this burden, Commissioner Powell clearly showed a legitimate, nondiscriminatory reason for the adverse employment action Walton suffered, specifically the legislatively mandated RIF which was the product of the exercise of a legitimate business judgment of the NMSLO. Walton has not carried her onerous burden of establishing that Commissioner Powell's

legitimate, nondiscriminatory reason for the RIF of her GM I position was a pretext for unlawful First Amendment discrimination.

Finally, even if Plaintiff were to convince the Court that the lower court was correct in determining Walton satisfied the *McDonnell Douglas* framework for establishing the violation of a constitutional right, Commissioner Powell is entitled to qualified immunity under the *Harlow v. Fitzgerald* objective reasonableness test. For these reasons, the Court should reverse the lower court's denial of Commissioner Powell's Motion for Summary Judgment and enter judgment in his favor dismissing Count VI of Plaintiff's Second Amended Complaint.

## CERTIFICATION

Appellant's Opening Brief complies with Type-Volume Limitation of Fed.R.App.P. 32(a)(7)(B) because it contains 13,482 words excluding parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(3).

I further certify: (1) Any privacy redactions have been made; (2) that the hard copies submitted to the Court are exact copies of the version submitted electronically; and (3) the electronic submission has been scanned for viruses using the most recent version of AVG CloudCare AntiVirus.

## STATEMENT REGARDING ORAL ARGUMENTS

Counsel submits that oral arguments will significantly aid the decisional

process as this case involves important fundamental public policy issues in the State

of New Mexico and this circuit.

Respectfully submitted this 7th day of January, 2015.

HATCHER & TEBO, P.A.

BY: */s/ Scott P. Hatcher*

Scott P. Hatcher, Esq.
Emma D. B. Weber, Esq.
150 Washington Avenue, Suite 204
Santa Fe, NM 87501
(505) 983-6525
Attorneys for Defendant/Appellant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 7th day of January, 2015, I filed the
foregoing electronically through the CM/ECF system, which caused the parties or
counsel registered to receive electronic service to be served by electronic means, as
more fully reflected on the Notice of Electronic Filing.

Jack Hardwick
SOMMER UDALL SUTIN
HARDWICK & HYATT, P.A.
P. O. Box 1984
Santa Fe, New Mexico 87504-1984
(505) 982-4676
Attorney for Plaintiff

*/s/ Scott P. Hatcher*

Scott P. Hatcher

## ADDENDUM TO APPELLANT'S OPENING BRIEF

**Exhibit 1**   Order on Defendants' Motion for Summary Judgment (Doc. 85)

**Exhibit 2**   Order on Motion for Summary Judgment of Defendants Ray Powell, David Britt and Delma Bearden as to Count VI (Doc. 86)

**Exhibit 3**   Memorandum Opinion (Doc. 91)

**Exhibit 4**   New Mexico Administrative Code Sections

**Exhibit 5**   New Mexico Statutes Sections