CASE NO. 14-2166

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

**PEGGY WALTON,**

     Plaintiff-Appellee,

v.

**NEW MEXICO STATE LAND OFFICE and
RAY POWELL,**

     Defendants-Appellants.

---

On Appeal from the United States Court for the District of New Mexico
The Honorable District Judge James O. Browning
1:13-cv-00343-JB-SCY

---

## APPELLEE'S BRIEF

---

Respectfully submitted,

SOMMER, UDALL, SUTIN,
HARDWICK & HYATT, P.A.
Attorneys for Plaintiff-Appellee

By:   /s/ Jack N. Hardwick
       Jack N. Hardwick
       P.O. Box 1984
       Santa Fe, New Mexico 87504-1984
       (505) 982-4676

ORAL ARGUMENT IS REQUESTED

# TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      I.     The district court correctly determined that Walton has a
            constitutionally protected interest in her affiliation with the
            Lyons administration (Issue 1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      II.    The trial court correctly determined that there are genuine
            issues of material fact as to whether Walton's political
            affiliation with Lyons was a substantial or motivating
            factor in Powell's decision to terminate Walton's
            employment (Issues 2 and 3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

      III.   The trial court correctly determined that there is a genuine
            issue of material fact as to whether Powell's proffered
            reason for the RIF is  pretextual (issue 4). . . . . . . . . . . . . . . . . . . . 36

      IV.   Powell's actions were unreasonable in light of clearly
            established Tenth Circuit precedent (issue 5). . . . . . . . . . . . . . . . . 41

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Appellate Case: 14-2166   Document: 01019387774   Date Filed: 02/19/2015   Page: 3

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

STATEMENT REGARDING ORAL ARGUMENTS . . . . . . . . . . . . . . . . . . . . . 52

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

# TABLE OF AUTHORITIES

PAGE

**Cases**

*Anderson v. Blake*,
    469 F.3d 910 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Anderson v. Creighton*,
    483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) . . . . . . . . . . . . 42, 48

*Balton v. City of Milwaukee*,
    133 F.3d 1036 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Bass v. Richards*,
    308 F.3d 1081 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Bivens v. Six Unknown Fed. Narcotics Agents*,
    403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 . . . . . . . . . . . . . . . . . . . . . 42

*Bowling v. Rector*,
    584 F.3d 956 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 5, 24

*Branti v. Finkel*,
    445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) . . . . . . . . . 27, 44, 48

*Butler v. City of Prairie Vill., Kan.*,
    172 F.3d 736 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Cassady v. Goering*,
    567 F.3d 628 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Charles v. Grief*,
    522 F.3d 508 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Connick v. Myers*,
    461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) . . . . . . . . . . . . 27, 29

Appellate Case: 14-2166  Document: 01019387774  Date Filed: 02/19/2015  Page: 5

*Cortez v. McCauley,*
    478 F.3d 1108 (10th Cir.2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*D'Angelo v. Sch. Bd. of Polk Cnty., Fla.,*
    497 F.3d 1203 (11th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Dickeson v. Quarberg,*
    844 F.2d 1435 (10th Cir. 1998) . . . . . . . . . . . . . . . 28, 29, 30, 43, 44, 46, 50

*Dixon v. Kirkpatrick,*
    553 F.3d 1294 (10th Cir.2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 26

*Dye v. Office of the Racing Com'n,*
    702 F.3d 286 (6th Cir.2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Elder v. Holloway,*
    510 U.S. 510, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994) . . . . . . . . . . . . . . 41

*Elrod v. Burns,*
    427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) . . . . . . . . . . . . . 43, 44

*Francia v. White,*
    594 F.2d 778 (10th Cir.1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Gamez v. Country Cottage Care & Rehab.,*
    377 F. Supp. 2d 1103 (D.N.M. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Gann v. Cline,*
    519 F.3d 1090 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . 42, 47, 48

*Gross v. Pirtle,*
    245 F.3d 1151 (10th Cir.2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Hatcher v. Bd. of Pub. Educ. & Orphanage,*
    809 F.2d 1546 (11th Cir.1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Hindman v. Thompson,*
    557 F. Supp. 2d 1293 (N.D. Okla. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 40

iv

Appellate Case: 14-2166   Document: 01019387774   Date Filed: 02/19/2015   Page: 6

*Jantzen v. Hawkins*,
　　188 F.3d 1247 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . 28, 33, 45, 46, 48

*Jirau Bernal v. Agrait*,
　　37 F.3d 1 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Klug v. Chicago School Reform Board of Trustees*,
　　197 F.3d 853 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Laidley v. McClain*,
　　914 F.2d 1386 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Lewis v. Tripp*,
　　604 F.3d 1221 (10th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*Mason v. Oklahoma Turnpike Auth.*,
　　115 F.3d 1442 (10th Cir.1997) . . . . . . . . . . . . . . . . . . . 29, 30, 33, 43, 45, 48

*McBeth v. Himes*,
　　598 F.3d 708 (10th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 25, 26

*McDonnell Douglas Corporation v. Green*,
　　411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) . . . . . . . . . . 39, 40, 41

*Mitchell v. Forsyth*,
　　472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) . . . . . . . . . . . . . . . . 2

*NAACP v. Alabama*,
　　357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) . . . . . . . . . . . . . . . . 28

*Nelson v. McMullen*,
　　207 F.3d 1202 (10th Cir.2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Pahls v. Thomas*,
　　718 F.3d 1210 (10th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 4, 51

*Pickering v. Bd. of Education*,
　　391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) . . . . . . . . . . . . 27, 29

Appellate Case: 14-2166    Document: 01019387774    Date Filed: 02/19/2015    Page: 7

*Quinn v. Vill. of Elk Grove Bd. of Fire & Police Comm'rs*,
  No. 01 C 8504, 2002 WL 31875464 (N.D. Ill. Dec. 24, 2002) . . . . . . . . . 28

*Radecki v. Barela*,
  146 F.3d 1227 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Rutan v. Republican Party of Illinois*,
  497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) . . . . . . . . . . . 27, 44, 48

*Saucier v. Katz*,
  533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) . . . . . . . . . . . 42, 43

*Smith v. Cochran*,
  339 F.3d 1205 (10th Cir.2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*TW Telecom Holdings Inc. v. Carolina Internet Ltd.*,
  661 F.3d 495 (10th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Walker v. City of Orem*,
  451 F.3d 1139 (10th Cir.2006) . . . . . . . . . . . . . . . . . . . . . . . 2, 24, 26, 34, 51

**Federal Rules of Civil Procedure**

Fed.R.Civ.P. 56(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**Federal Rules of Appellate Procedure**

Fed.R.App.P. 32(a)(7)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

**Statutes**

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 31, 40

**Regulations**

N.M. Code 1.7.10.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Appellate Case: 14-2166   Document: 010119387774   Date Filed: 02/09/2015   Page: 8

**Other Authorities**

New Mexico State Personnel Act, NMSA 1978, § 10-9-1, *et seq.*   . . . . . . . . . . . 6

## JURISDICTIONAL STATEMENT

The Defendant-Appellant, Ray Powell (Powell), is a former New Mexico Commissioner of Public Lands. The Commissioner of Public Lands is an elected position and is the highest ranking position in the New Mexico State Land Office (SLO). Powell served twice as Commissioner, the second time from January 1, 2011, through December 31, 2014. Patrick Lyons (Lyons), served as Commissioner between the first Powell administration and the second Powell administration. The Plaintiff Peggy Walton (Walton) was an employee of the SLO, who Lyons hired during 2008. Shortly after Powell took office as Commissioner the second time, Powell terminated Walton's employment through the implementation of a reduction in force (RIF) plan.

Walton sued Powell pursuant 42 U.S.C. § 1983. Walton contends that Powell terminated her employment because of Walton's political affiliation with the Lyons administration, in violation of Walton's First and Fourteenth Amendment right of association. Powell filed two motions for summary judgment dismissing Walton's § 1983 claim. In the first motion, Powell argued that, under undisputed facts, Walton cannot make a *prima facie* case. (Aplt. App. at 96-180). In the second motion, Powell argued that he has qualified immunity. (Aplt. App. at 181-226). The district court denied both motions (Aplt. App. at 447-448, 449-450). Powell has appealed the

1

district court's denial of his motions. (Aplt. App. at 565-556).

An order denying a summary judgment motion is generally not an appealable order under 28 U.S.C. § 1291. *See Bowling v. Rector*, 584 F.3d 956, 963 (10th Cir. 2009). The Court of Appeals, however, has jurisdiction when the defendant is a public official asserting a qualified immunity defense, and the appealed issue is whether a given set of facts establishes that the defendant violated clearly established law. *McBeth v. Himes*, 598 F.3d 708, 714-15 (10th Cir. 2010); citing *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). A district court's determination that the record raises a genuine issue of material fact precluding summary judgment in favor of the defendant, however, is not appealable even in a qualified immunity case. *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1301 (10th Cir.2009). "A defendant may not immediately appeal a district court's order denying qualified immunity ... merely to dispute the district court's conclusions that plaintiff's claims are supported by sufficient evidence in the record or that disputed issues of material fact exist which preclude summary judgment." *Walker v. City of Orem*, 451 F.3d 1139, 1154 (10th Cir.2006).

Powell cites *Lewis v. Tripp*, 604 F.3d 1221 (10th Cir. 2010) and *Pahls v. Thomas*, 718 F.3d 1210 (10th Cir. 2013) for the proposition that this Court has jurisdiction to review the district court's determination that there are genuine issues

of material fact that preclude summary judgment. (Aplt. Opening Br. at pp 21-22). Those cases, however, are not applicable to the circumstances here. In *Lewis*, this Court, in considering an appeal of an order denying qualified immunity, reviewed the evidence before the district court because the district court "...did not set forth with specificity the facts supporting its conclusion that the [defendant] violated [plaintiff's] Fourth Amendment rights." *Lewis,* 604 F.2d at 1223. In this case, however, the district court outlined in great detail the facts, which if proven at trial, would support the conclusion that Powell violated Walton's First Amendment right of association. (Aplt. App. at 557-559).

In *Pahls*, the district court denied a motion for summary judgment granting qualified immunity to several law enforcement officers who provided security at an event attended by former President George W. Bush. The district court, however, failed to identify, separately for each defendant, the specific actions or policies for which each defendant allegedly was responsible and the evidence bearing on each defendant's state of mind, and then to determine, as to each defendant, whether the evidence was sufficient to go to the jury. *Pahls*, 718 F.3d at 1232. The *Pahls* Court therefore concluded that the Court had jurisdiction to review the evidence. *Pahls, id.* Those circumstances are not present in this case. Here the district court described in detail the evidence that Powell retaliated against Walton because of Walton's political

3

affiliation with Lyons.  (Aplt. App. at 557-559).

This Court reiterated in *Pahls* that when a district court has denied qualified immunity at the summary judgment stage, the Court of Appeals must accept as true the district court's determination that a reasonable jury could find certain specified facts in favor of plaintiff.  *Pahls*, 718 F.3d at 1217.  This Court does not have jurisdiction to review the district court's determination that there are genuine issues of material fact as to whether Walton's political affiliation with Lyons was a substantial or motivating factor in Powell's decision to terminate Walton's employment, and whether Powell's reason for the termination is a pretext.  Powell, has improperly attempted to invoke this Court's jurisdiction to  dispute the district court's conclusions that there are disputed issues of material fact that preclude summary judgment.  *Bowling v. Rector*, 584 F.3d 956, 963 (10th Cir. 2009).

## STATEMENT OF THE ISSUES

Powell has stated five separate issues for appeal.  For purposes of clarity, Walton restates those issues here:

1)     Whether Walton had any constitutionally protected interest in a political affiliation with the predecessor Lyons administration;

2)     Whether the district court erred in determining that Walton established a *prima facie* case of political retaliation in violation of Walton's First Amendment

4

right of association;

     3)     Whether Walton showed a genuine issue of material fact regarding Powell's motivation in approving a RIF plan under which Walton's employment with the New Mexico State Land Office (NMSLO) was terminated;

     4)     Whether Powell offered legitimate, non-discriminatory reasons for the RIF, and, if so, whether Walton met her burden of showing a genuine issue of material fact as to whether Powell's proffered reason were pretextual; and

     5)     Whether Powell's actions were objectively reasonable in light of clearly established laws such that he is entitled to qualified immunity.

     With respect to issues 2, 3, and 4, Powell has improperly challenged the trial court's determination that there are genuine issues of material fact that preclude the entry of summary judgment. As discussed above, this Court does not have jurisdiction to consider those challenges. *McBeth v. Himes*, 598 F.3d 708, 714-15 (10th Cir. 2010); *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1301 (10th Cir.2009); and *Bowling v. Rector*, 584 F.3d 956, 963 (10th Cir. 2009).

## STATEMENT OF THE CASE

     Walton has been registered to vote as a Republican since approximately 1980. (Aplt. App. at 251). From January 1988 to December 2001, Walton was employed at Miners' Colfax Medical Center in Raton, New Mexico, as an administrative

assistant. During that time Walton became acquainted with Lyons, a Republican,

who at that time was the State Senator for the district which includes Colfax County.

(Aplt. App. at 251). Lyons was elected to serve as the New Mexico Land

Commissioner for a second term which began on January 1, 2007. Powell, a

Democrat, served as Land Commissioner immediately before Lyons. (Aplt. App. at

254). Walton is a Republican and is politically affiliated with Lyons (Aplt. App. at

251).

After Lyons was elected, Walton applied for employment at the SLO several

times, but initially did not receive any response. (Aplt. App. at 252). In about

January 2008, Walton spoke directly to Lyons and told Lyons that she had been

applying for positions at the SLO, without response. Lyons told Walton that there

were open positions, and that Walton should keep applying. (Aplt. App. at 252). On

June 18, 2008, Walton applied for a classified position[1] at the SLO. After Walton

applied for that classified position, Lyons and others interviewed Walton. Following

those interviews, Walton was offered an exempt[2] Secretary II position. (Aplt. App.

---

[1] Classified employees have the protections of the New Mexico State Personnel Act, NMSA 1978, § 10-9-1, *et seq*. (See Aplt. Brief, Ex. 4, Sections 1.7.1.7(G) and (S)). Exempt employees are employees who serve at the will of the agency head. Exempt employees do not have the protections afforded to classified employees under the State Personnel Act, and generally can be fired at the will of the agency head. (Aplt. App. at 302, 316).

[2] See fn. 1, *Id.*

at 252).   Walton accepted the exempt Secretary II position, and began her employment at the SLO on August 25, 2008. (Aplt. App. at 252).

Walton's first job assignment at the SLO was working in the Commercial Resources Division as a special projects coordinator and lease analyst.  On or about October 22, 2008, Walton accepted the position of director of the commercial leasing section of the Commercial Resources Division, a position for which Walton was qualified.  As director of the commercial leasing section Walton supervised the lease analysts, including Delma Bearden (Bearden), an employee who had been hired in the Powell administration before Lyons was elected. (Aplt. App. at 252-253).

In early 2009, Lyons instructed Sandra Lopez (Lopez), the SLO's Human Resources Manager, to transfer Walton from the exempt Secretary II position to a vacant classified Economist A position in the Commercial Resources Division, and then to reclassify the Economist A position to a classified General Manager I (GM I) position, which was a position for which Walton was qualified.  Walton did not have the credentials to fill the Economist A position and told Ms. Lopez that she did not have the necessary credentials.  Walton understood, however, that Ms. Lopez would follow Commissioner Lyons' directive to reclassify the Economist A position to a GM I position.  (Aplt. App. at 253).

After the SLO transferred Walton to the Economist A position, Lopez refused

7

to initiate the paperwork with the State Personnel Office (SPO) to reclassify the Economist A position to a GM I position. Finally, after Lopez repeatedly refused, for over a year, to initiate the paperwork, Lyons directed Walton to bypass Lopez and to work directly with the SPO to accomplish the reclassification. Walton did so. The reclassification was accomplished and approved effective September 8, 2010. After the reclassification, Walton continued to serve as the director of the commercial leasing section of the Commercial Resources Division. (Aplt. App. at 253).

Lyons served as Land Commissioner for two consecutive terms, the second of which expired on December 31, 2010, and did not run for re-election. Powell, who served as Land Commissioner immediately before Lyons' first term, defeated the Republican candidate for Land Commissioner, Matthew Rush, in the November 2, 2010 general election. The 2010 campaign for Land Commissioner was very contentious. During the campaign Powell repeatedly attacked Lyons, and accused Lyons of engaging in unethical conduct and mismanaging State trust lands, and publicly stated that, if elected, Mr. Rush would continue the same policies as Lyons. (Aplt. App. at 254).

During the summer and fall of 2010, Walton attended a number of Republican campaign events, including rallies for Susana Martinez, a Republican running for Governor, which Mr. Rush also attended. Walton also attended a campaign event for

8

Mr. Rush at a restaurant in Española, New Mexico. Walton traveled to that event
with Lyons and other employees of the SLO. (Aplt. App. at 254). Walton's support
of Lyons and the Republican Party was known by employees of the SLO, including
Lopez. Walton had a photograph of herself and (now Governor) Susana Martinez,
and a photograph of Lyons with a personal note from Lyons to Walton, hanging on
the wall in her office. During the fall of 2010, Walton observed Lopez studying those
photographs. (Aplt. App. at 254). Powell defeated Mr. Rush in the November 2,
2010, general election. The day after the election, Walton told Bearden that she had
voted for Mr. Rush, and Bearden told Walton that she had voted for Powell. (Aplt.
App. at 254).

On or about November 17, 2010, Mark Corley, an associate of KRQE
investigative reporter Larry Barker, approached Walton at the back entrance to the
SLO building when Walton arrived at work, and informed Walton that Walton's
employment information had become known to him. Mr. Corley interviewed Walton
and asked Walton questions about the circumstances of her hiring, her transfer from
the exempt Secretary II position to the classified Economist A position, and the
reclassification of the Economist A position to the GM I position. Walton believed,
from the context of the interview, that KRQE intended to portray these events in a
negative light, and that Lopez, in her capacity as the SLO's Human Resources

9

Manager, had furnished Walton's personal employment information to KRQE. (Aplt.

App. at 254-255).

On or about November 18, 2010, Walton telephoned Commissioner-elect

Powell, to inform Powell about her communications with Mr. Corley. Walton felt an

obligation to let Powell to know that KRQE was going to be broadcasting a negative

story about Walton and the SLO. On November 21 or 22, 2011, Powell, along with

Harry Relkin (Relkin), an attorney who Powell hired to serve as general counsel to

the SLO, returned Walton's telephone call. During the telephone conversation

Walton informed Powell and Relkin about the circumstances of her hiring into the

exempt Secretary II position, her transfer to the classified Economist A position,

Commissioner Lyons' directions to Lopez to reclassify the Economist A position to

the classified GM I position, and Lopez's refusal to follow Lyons' directions. (Aplt.

App. at 255).

KRQE television broadcast the Larry Barker investigative report on November

23, 2010. The KRQE investigative report was titled: "Cronies move up as officials

move out." Anchor reporter Dick Knipfing introduced the news segment by saying,

among other things, that Walton was "distinctly unqualified" for her position and that

her hiring was "rigged." Mr. Barker began his report with the statement: "Meet State

Land Office employee Peggy Walton. How she went from low-level political

10

appointee to high-level division manager in two short years is a fascinating case study

in abuse of power." Mr. Barker accurately reported that Walton was hired in the

Lyons administration as an exempt position, and then moved into the classified

service before the election, but misleadingly and inaccurately described the

circumstances of Walton's hiring, and the sequence of events that led to her being

placed in the GM I position. Then SPO Director, Sandra Perez, who had approved

the reclassification, was interviewed. Ms. Perez pointedly deferred to Lyons for an

explanation. The report ended with Mr. Knipfing stating: "Governor-elect Susana

Martinez has promised to fire any political appointee who has been improperly

shifted into a classified job.... New Land Commissioner Ray Powell will inherit

Walton. It is not clear whether her job is protected." (Aplt. App. at 255-256).

Powell watched the Larry Barker investigative report online within a few days

after KRQE broadcast the report. (Aplt. App. at 305). Powell considers Larry Barker

to be the "gold standard" in investigative reporting (Aplt. App. at 304), and believes

that Larry Barker's reports are "thorough and vetted." (Aplt. App. at 305). Powell

testified that, after he viewed the story, Powell "had no reason to disbelieve [what

Larry Barker said about Peggy Walton]." (Aplt. App. at 306). Powell understood,

after watching the report, that Lyons had hired Walton in an exempt position and then

transferred her into a classified economist position. Powell testified that he took that

11

information "under advisement." (Aplt. App. at 306). Powell's understanding is that "historically ....the exempt employees that serve with one elected official leave the office and the new elected official has the opportunity to appoint people into that exempt position." (Aplt. App. at 302).

Powell took office as Land Commissioner on January 1, 2011. Powell brought in his own management team, including the following exempt employees who replaced exempt employees in the Lyons administration: A) Robert Jenks (Jenks), Deputy Commissioner, who reported directly to Powell; B) Harry Relkin (Relkin), Chief Legal Counsel, who reported to Jenks; C) Donald Britt (Britt), Assistant Commissioner over the Commercial Resources Division, who reported to Jenks; and D) Elaine Olah (Olah), Assistant Commissioner over the Administrative Services Division, who reported to Jenks. (Aplt. App. at 256).

Monday, January 3, 2011, was Walton's first day in the office in 2011. When Walton arrived at work, there was a note on the door to her office which said, "This office is reserved for Donald Britt." Britt was employed during the first Powell administration, and then was hired by Powell to serve again in Powell's second administration. (Aplt. App. at 257). Powell admitted that he placed the note on the door to Walton's office before staff arrived to work on January 3, 2011. (Aplt. App. at 307).

12

Beginning January 3, 2011, Britt was Walton's direct supervisor. On January
3 or 4, 2011, Powell met with the Commercial Resources Division staff, along with
Jenks and Britt. During the meeting Powell expressed his opinion that the
stewardship and leasing of State Trust Lands under the Lyons administration had not
been handled properly, and he stated there would be federal investigations to find out
who was involved. Powell stated that "men in suits with guns" were going to come
to the office and implied that those "men in suits with guns" would arrest anyone
involved in any wrongdoing. (Aplt. App. at 257). On January 24, 2011, Britt and
Bearden together, accused Walton of illegally administering a land sale that had
closed during Commissioner Lyons' term in the latter part of December 2010. (Aplt.
App. at 257).

Because Powell made threatening remarks during the January 4, 2011, meeting
about allegedly illegal conduct in the Lyons administration, and because Britt and
Bearden had been making comments to Walton about allegedly illegal conduct in the
Lyons administration, Walton asked her attorney, Linda Hemphill, to contact Powell
regarding Walton's concerns that Walton was being mistreated because of her
previous association with the Lyons administration. (Aplt. App. at 257-258). On
January 27, 2011, Ms. Hemphill delivered a letter to Powell in which Ms. Hemphill
informed Powell of Walton's affiliation with Lyons going back to Walton's

employment at Miners' Colfax Medical Center, the circumstances of Walton's hiring
and promotion during the Lyons administration, and Walton's belief that Lopez had
inappropriately provided Walton's confidential personnel information to KRQE news.
(Aplt. App. at 258). Ms. Hemphill, on Walton's behalf, asked Powell to admonish his
staff "that continued harassment of Ms. Walton because of her prior association with
Commissioner Lyons would be legally actionable pursuant to 42 U.S.C. § 1983."
(Aplt. App. at 270).

In his deposition, Powell claimed that he does not remember taking any action
to address Walton's concerns described in Ms. Hemphill's letter. (Aplt. App. at 308),
but testified that his ordinary course of business would have been to provide a copy
of Ms. Hemphill's letter to "legal." (Aplt. App. 308). Powell also testified that he
may have provided a copy of the letter to Lopez's supervisors, Olah and Jenks,
because Ms. Hemphill stated in her letter that Walton suspected that Lopez had
provided confidential personnel information about Walton to Larry Barker. (Aplt.
App. at 270, 309).

At a February 8, 2011 Commercial Resources Division meeting, there were
questions about two leases administered during the Lyons administration. Bearden
pointed two fingers at two female Republican staff members in an accusing manner
and said, "you two girls worked in the front office" with former Commissioner Lyons,

14

implying that those employees knew of allegedly improper handling of those leases. Walton reported Bearden's conduct, which Walton felt was inappropriate harassment, to Britt. (Aplt. App. at 258).    On or about February 9, 2011, Walton was told to attend the Assistant Commissioners meeting.  Neither Powell, nor Britt, nor Jenks had ever asked Walton to attend one of those meetings before that date.  During the meeting Walton reported about a request she had received for leasing acreage.  At this meeting, Relkin rolled his eyes and exchanged glances with Powell when Walton was giving her report. (Aplt. App. at 258-259).

On February 16, 2011, Walton was called into a meeting with Powell, which was attended by Relkin, Jenks, Olah, Britt, Lopez, and Amy Atchley.  The purpose of the meeting was to inform Walton that Ms. Atchley was being moved from the Legal Division to the Commercial Resources Division, where Walton would supervise her.  No reason was given to Walton for the transfer.  The transfer was a complete surprise to Walton.  During the Lyons administration, Ms. Atchley had been transferred from the Commercial Resources Division to the Legal Division because she had been very disruptive in the Commercial Resources Division, and Walton had written up Ms. Atchley for performance and misconduct on several occasions.  Ms. Atchley also had spread a false rumor that Lyons and Walton were involved in a romantic relationship.  Walton had previously reported to Lopez that Ms. Atchley had

15

spread the false rumor. Lopez and Jenks smirked at Walton throughout the meeting. (Aplt. App. at 259).

On or about February 18, 2011, Walton went to lunch with Lyons and expressed her concerns to Lyons about the allegations that a land sale that Walton had administered during Lyons' tenure as Land Commissioner was "illegal." There were other SLO employees in the same restaurant. Shortly after that lunch, Assistant Commissioner Ralph Gallegos informed Walton that Powell does not believe in going to lunch with his employees, which led Walton to believe that Powell was aware that Walton had gone to lunch with Lyons. (Aplt. App. at 259-260).

During January, February and March 2011, Britt made several comments to Walton referring to Lyons. Among other things, Britt said several times "have you seen Pat?" or "how's your buddy Pat" referring to Lyons. Related to those comments, on or about February 22, 2011, Britt told Walton "no one in the Land Office respects you." Then, on or about February 24, 2011, Britt told Walton about a meeting that he, Powell, and others, had with Larry Barker and taunted Walton, referring to Larry Barker as "your friend Larry." (Aplt. App. at 260).

During January, February, March and April 2011, Bearden, who Walton supervised, became increasingly insubordinate and hostile towards Walton. Britt moved Bearden's office next to his and began to direct Bearden's work. Walton

16

observed that Bearden and Britt had a very close relationship, often meeting behind closed doors. Although Walton continued to supervise some aspects of Bearden's work, Britt became Bearden's primary supervisor. During that same time frame, Bearden increasingly began to make derogatory comments of a sexual and racial nature, which Walton believed, based upon her training, were inappropriate and violated SLO policies. (Aplt. App. at 260).

During February, March and April 2011, Walton verbally reported her concerns about Bearden's conduct to Britt on numerous occasions, and on April 7 and 8, 2011, sent Britt emails in which Walton raised some of her concerns about Bearden's misconduct. Britt did not respond to Walton's emails, and, to Walton's knowledge, took no action to address Walton's concerns. (Aplt. App. at 260). According to Powell, and unbeknownst to Walton, on April 6, 2011, Powell approved a plan to terminate Walton's employment through the implementation of a reduction in force (RIF) plan, which Olah had been developing at Powell's direction since early February 2011. (Aplt. Appx. at 140, 310; Aplt. Opening Br. at p. 8).

On April 14, 2011, Walton attended a meeting of the State Trust Lands Advisory Board. The Board assists the Commissioner in the formulation of policies and programs for the Trust. Although the meeting started at 10:00 A.M., Britt directed Walton to appear at 10:30 A.M. When Walton arrived, the meeting was

17

underway.  The Board members, Powell, and employees of the SLO, including Britt and Olah, were already seated.  The only available seat was directly across a conference room table from Powell, and Walton sat there.  (Aplt. App. at 260-262). During Powell's presentation to the Board,  Powell referred to the Barker report, and followed up by saying he "was concerned about employees in inappropriate roles, 'protected employees.'"  (Aplt. App. at 272, 274).  Powell then stated: "These employees for some reason didn't have to meet the leadership criteria within the divisions, and somehow got direction from the front office." (Aplt. App. at 272, 274). Although Powell did not mention Walton by name, and now claims that his statements were in reference to two other employees, Powell was glaring directly at Walton in a very threatening and serious manner during the time he made those remarks.  (Aplt. App. at 261).

Judge Browning found that the "strongest evidence of retaliation is Powell's statements at the April 14, 2011 meeting."  Judge Browning stated:

> At that meeting, Powell referred to the Barker report, which featured Walton and referred to her as a political crony, and then complained about "protected employees" who were unqualified and received directions from the front office to bypass the ordinary chain of command. While Powell denies that he was referring to Walton when making those statements, circumstantial evidence evidences the contrary.  This meeting took place only eight days after Powell made the decision to terminate Walton's

18

position.  Powell was glaring at Walton when he made the statements.  Moreover, his statements accurately described Walton's circumstances during her time in the Lyons administration: Lyons directed her to bypass Lopez- the normal chain of command- to reclassify her position to a Manager I position, which is a classified position with certain protections under the State Personnel Act– a protected position.  Additionally, Powell mentioned the Barker report earlier in the meeting, which referred to Walton as Lyons' political crony and stated that she was unqualified.  Taking these facts as a whole, and viewing them in a light most favorable to Walton, a reasonable jury could conclude that Powell was referring to Walton when discussing protected employees.

(Aplt. App. at 558-559)

Throughout April 2011, Bearden's conduct escalated. Bearden frequently made comments that Walton believed were sexually or racially inappropriate.  Those comments made Walton uncomfortable and Walton believed, based upon her training and knowledge of SLO policies, that those comments were improper and could subject the SLO to liability for creating a sexually or racially hostile work environment.  When Walton verbally addressed Bearden's behavior to Bearden as these incidents would occur, Bearden became even more contentious and accusatory. Bearden repeatedly justified her behavior and comments to Walton by saying, "I have worked with this administration before", referring to her employment in the first Powell administration.  (Aplt. App. at 261-262).

19

By memos to Britt dated April 29 and April 30, 2011, that Walton delivered to Britt on May 6, 2011, Walton described Bearden's inappropriate conduct, that Walton believed constituted illegal sexual, racial, and religious harassment. Walton reported her concerns to Britt, because the SLO's harassment policy provides that a report of harassment can be made to an employee's supervisor. Following Walton's reports to Britt, Bearden continued to make inappropriate comments of a sexual and racial nature. (Aplt. App. at 262).

From February 2011, through the end of her employment, Walton attended weekly leadership meetings headed by Powell and Jenks, which were attended by various management employees. Many times when Walton gave her reports, expressed her opinion, or participated in the discussion, Powell and Jenks were aloof, and would cut Walton off or make facial gestures. Powell frequently intimidated and threatened in those meetings by making comments like: "if you don't like it here we will be glad to help you find a place of your liking." (Aplt. App. at 262-263).

On June 10, 2011, Powell submitted the RIF plan to the State Personnel Office, and received approval from the State Personnel Office on that same date. (Aplt. App. at 311). That same day, Walton was called into a meeting with Olah, Britt and Lopez. Walton was informed that her employment was being terminated effective June 30, 2011, because of a RIF, and that Walton would be on paid administrative

20

leave immediately through June 30, 2011. Walton was directed to pack her personal belongings and directed to turn in her keys and leave the building immediately. Before June 10, 2011, no one ever informed Walton that her position could possibly be eliminated through a RIF. (Aplt. App. at 263). Although Olah developed the RIF plan, Powell is the one who made the decision to terminate Walton's employment through the implementation of the RIF. (Aplt. App. at 310).

By email dated June 10, 2011, at 1:09 p.m., Powell informed the entire staff of the State Land Office statewide that Walton's employment had been terminated. Walton found this to be extremely unusual, and it was embarrassing and humiliating to Walton. In Walton's almost thirty years working in State government, Walton has never seen such an announcement of the termination of an employee's employment. (Aplt. App. at 263, 287).

Powell contends that the RIF was necessary because, under the General Appropriations Act of 2011, the SLO had to reduce, for fiscal year 2012 which commenced on July 1, 2011, the number of full time equivalent (FTE) positions by two positions, and also operate within a reduced budget. (Aplt. App. at 97). Olah, the alleged designer of the RIF plan, admitted that options were available to the SLO to meet the requirements of General Appropriations Act, that did not involve the elimination of Walton's General Manager I position. (Aplt. App. at 293, 294, 296-

21

297).  Although Olah now claims that the design of the RIF was based upon her "review of the entire agency", Olah is unable to describe exactly what she reviewed, and has no documentation evidencing her alleged review of the entire agency.  (Aplt. App. at 295).  Olah admitted that the SLO did not explore other alternatives to terminating Walton's employment.  (Aplt. App. at 294, 299).

Olah's affidavit testimony that  "the Commercial Resources Division structure was out of sync with the  rest of the agency" is factually inaccurate.  Other divisions, for example the Mineral Resources Division, had a similar structure.  The fact that several subordinates reported to Walton, while none reported to the other GM I, who supervised the renewable energy section, was due to the fact that the renewable energy section was a new section, and consequently there was not yet as much work in that section.   After eliminating Walton's position, the SLO reorganized the Commercial Resources Division so that there were then more management positions than when the SLO employed Walton as a GM I.  (Aplt. App. at 263-264).

At the time of the RIF, there were two open positions for which Walton was qualified in the SLO. Those positions were a Line Manager II position in Central Records, and one of two Management Analyst positions in Commercial Resources. Although State Personnel Board Rule 1.7.10.9 (Aplt. Opening Br. Ex. 4) specifies that employees affected by a RIF "shall be provided the right of first refusal to any

position to be filled within the agency for which they meet the established requirements at the same or lower midpoint of the position the employee currently holds", the SLO did not provide Walton with a right of first refusal for those positions. (Aplt. App. at 264).

As of June 10, 2011, the date on which Walton was informed that her employment was being terminated pursuant to a RIF, there were at least twelve vacant positions in the SLO. The SLO could have reduced its FTE count by two, as required by the General Appropriations Act of 2011, by eliminating two vacant positions. Instead the SLO chose to eliminate one vacant position, and the classified GM I position which Walton held. The SLO easily could have met the fiscal year 2012 budgetary requirement of the General Appropriations Act by not filling one of the three vacant positions, that the SLO chose to fill at the same time it was planning to the SPO to eliminate Walton's position. (Aplt. App. at 264-265). Moreover, the SLO could easily have met any budget shortfall that might have arisen had it continued to employ Walton, through a Budget Adjustment Request (BAR). The SLO increased its budget in fiscal years 2011 and 2012, combined, by over one million dollars through BARs, and added to its base FTE in fiscal year 2012 by hiring several temporary employees who were still serving as of the end of 2013. (Aplt. App. at 264-265).

23

Afer considering Powell's argument that Powell's evidence demonstrated a
legitimate nondiscriminatory reason for Walton's termination, and Walton's evidence
of pretext, Judge Browning concluded: "While [Powell's] evidence may support a
finding of a legitimate, nondiscriminatory reason for choosing Walton's position for
the RIF, the Court finds that Walton has produced sufficient evidence for a jury to
conclude that the Defendants' proffered reasons are pretextual." (Aplt. App. at 559).

## SUMMARY OF THE ARGUMENT

Powell has improperly asked this Court to review the evidence that supports
the district court's determination that there are genuine issues of material fact as to
whether Walton's political affiliation with the Lyons administration was a substantial
or motivating factor in Powell's decision to terminate Walton's position, and whether
Powell's proffered reasons for targeting Walton for the RIF are a pretext for violating
Walton's First Amendment right of association. *Bowling*, 584 F.3d at 963.  The
district court properly determined that there are genuine issues of material fact
regarding those matters, which preclude the entry of summary judgment.  Powell
cannot, by this interlocutory appeal, "...dispute the district court's conclusions that
...that disputed issues of material fact exist which preclude summary judgment."
*Walker*, 451 F.3d at 1154.  Powell's argument that the district court's rulings are
"based on legally insufficient or unsupported evidence in the record" (Aplt. Opening

Br., at p. 19), is incorrect. Powell has asked this Court to view his evidence as though it was not disputed.

The district court correctly concluded that Powell does not have qualified immunity from Walton's claim that Powell targeted Walton for the RIF because of Walton's political affiliation with the Lyons administration. As of the date Powell terminated Walton's employment, it was clearly established, under Supreme Court and Tenth Circuit precedent, that a public employee's affiliation with a prior administration is protected First Amendment activity, which cannot be a substantial or motivating factor in the employee's dismissal, without violating the First Amendment. (Aplt. App. 561-562).

## STANDARD OF REVIEW

This Court applies a de novo standard of review of an order denying summary judgment on the ground of qualified immunity. *Gross v. Pirtle*, 245 F.3d 1151, 1155 (10th Cir.2001); and *Cassady v. Goering*, 567 F.3d 628, 634 (10th Cir. 2009). "When a defendant raises the qualified immunity defense on summary judgment, the burden shifts to the plaintiff to meet a strict two-part test." *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir.2000). The plaintiff must show (1) that the defendant violated a constitutional or statutory right, and (2) that this right was clearly established at the time of the defendant's conduct. *Gross*, 245 F.3d at 1155–156; and *McBeth v. Himes*,

25

598 F.3d 708, 715-16 (10th Cir. 2010). This Court reviews the evidence in the light most favorable to the nonmoving party. *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir.2007) (en banc). Summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2); *and McBeth, id.*

Whether a plaintiff has alleged conduct by a defendant that violates the Constitution, and whether prior law clearly prohibited the defendant's conduct, are questions that this Court will review de novo. *Radecki v. Barela*, 146 F.3d 1227, 1229 (10th Cir. 1998). This Court does not, however, have jurisdiction to review the district court's determination that there are genuine issues of material fact that preclude the entry of summary judgment. *McBeth,* 598 F.3d at 714-15 (10th Cir. 2010); *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1301 (10th Cir.2009); and *Walker v. City of Orem*, 451 F.3d 1139, 1154 (10th Cir.2006). Applying these well-established standards, the district court's orders should be affirmed.

## ARGUMENT

**I.   The district court correctly determined that Walton has a constitutionally protected interest in her affiliation with the Lyons administration (Issue 1).**

Powell argues erroneously that Walton does not have a constitutionally

26

protected interest in her association with the Lyons administration. According to

Powell, Walton has the burden of showing that her association with Lyons is a matter

of "public concern." In making this argument Powell has improperly conflated the

analysis of First Amendment speech claims under *Pickering v. Bd. of Education*, 391

U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) and *Connick v. Myers*, 461 U.S.

138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), with the analysis of First Amendment

association claims under *Branti v. Finkel*, 445 U.S. 507, 514-15, 100 S.Ct. 1287, 63

L.Ed.2d 574 (1980) and *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 72, 76-78, 110

S.Ct. 2729, 111 L.Ed.2d 52 (1990). *Pickering* and *Connick* apply only to First

Amendment speech claims, and require that speech be a matter of public concern to

be protected. Neither *Branti* nor *Rutan,* nor any Tenth Circuit case following *Branti*

*and Rutan*, requires that an association be a "matter of public concern" to be

constitutionally protected.

Powell relies on the case of *Klug v. Chicago School Reform Board of Trustees*,

197 F.3d 853, 857 (7th Cir. 1999), in which the Seventh Circuit, relying on *Pickering*

and *Connick,* opined that in the Seventh Circuit "a public employee is protected from

adverse employment consequences based on the exercise of the right to freedom of

association only when the associational conduct relates to a matter of public

concern." *Klug*, however, is directly contrary to *Branti* and *Rutan*, and clearly

27

established Tenth Circuit jurisprudence regarding First Amendment association claims. *See e.g. Dickeson v. Quarberg,* 844 F.2d 1435, 1442-43 (10ᵗʰ Cir. 1998); and *Jantzen v. Hawkins*, 188 F.3d 1247, 1251 (10th Cir. 1999). *Klug* has been criticized in other circuits, and even in the Seventh Circuit, because it conflates the analysis of First Amendment speech and association claims. *See e.g. D'Angelo v. Sch. Bd. of Polk Cnty., Fla.,* 497 F.3d 1203, 1212 (11th Cir. 2007); *and Quinn v. Vill. of Elk Grove Bd. of Fire & Police Comm'rs*, No. 01 C 8504, 2002 WL 31875464, at *3 (N.D. Ill. Dec. 24, 2002).

In *D'Angelo* the Eleventh Circuit Court stated: "We have long held that, unlike speech or petitions by public employees, associational activity by public employees need not be on matters of public concern to be protected under the First Amendment. ... We explained in *Hatcher [v. Bd. of Pub. Educ. & Orphanage, 809 F.2d 1546, 1558 (11th Cir.1987)]* that 'application of a requirement that associational activity relate to a matter of public concern in order to be constitutionally protected would overturn Supreme Court and Eleventh Circuit jurisprudence,' such as *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)." *De'Angelo*, 497 F.3d at 1212. (Internal citations omitted).

Even in the Seventh Circuit, the grafting of the "public concern" requirement to an association claim has been questioned. In a concurring opinion in *Balton v. City*

28

*of Milwaukee*, 133 F.3d 1036 (7th Cir. 1998), Judge Cudahy observed:

> "*Pickering* and *Connick* do not supply a relevant test for purely associational claims because such cases generally do not involve interference with the work relationship... *Pickering* and *Connick* essentially require a court to weigh this sort of disobedience of a work directive against the values protected by the First Amendment. The *Pickering/Connick* test serves to simplify this balancing process by eliminating liability where First Amendment concerns are weak (i.e., the speech in question is not of public concern). But in the typical pure association case, the fact of association or of non-association has no impact on the work relationship and no balancing is necessary. Thus there is no need for a 'public concern' test to short-cut the balancing process. Because the pure associational activities of government employees generally do not interfere with work relationships, there seems no good reason to apply the *Pickering/Connick* analysis in this context." *Balton,* 133 F.3d at 1041.

In the Tenth Circuit it has long been established that "the First Amendment protects public employees from discrimination based upon their political beliefs, affiliation, or non-affiliation unless their work requires political allegiance." *Mason v. Oklahoma Tpk. Auth.*, 115 F.3d 1442, 1451 (10th Cir. 1997) *overruled on other grounds by TW Telecom Holdings Inc. v. Carolina Internet Ltd.*, 661 F.3d 495 (10th Cir. 2011); and *Dickeson,* 844 F.2d at 1442-43. Powell erroneously argues, however, that "political association claims do not survive summary judgment where there is no showing of any adverse employment action which was in retaliation for one's *political belief.*" (Emphasis added). Powell has cited no authority for that erroneous proposition. In the Tenth Circuit it is clear that retaliation against a public employee

29

because of the employee's political affiliation violates the First Amendment. *See Mason,* 115 F.3d at 1451; *and Dickeson,* 844 F.2d at 1442-43.

The facts in *Dickeson* were very similar to the facts in this case. In *Dickeson,* the plaintiffs, Dickeson and Weaver, alleged that the Defendant, Sheriff Quarberg, violated their First Amendment right of association when Sheriff Quarberg terminated their employment because of their affiliation with the former sheriff. *Dickeson,* supra, 844 F.2d at 1436. On appeal, this Court held that the termination of the employment of Dickeson and Weaver, because of their affiliation with the former sheriff, would violate their First Amendment right of political association. The Court held, however, that there were factual issues as to whether Sheriff Quarberg terminated their employment because of their affiliation with the former sheriff and remanded the case for trial on that issue. Nothing in *Dickeson* requires an affiliation to be tied to support for a particular political party, candidate for election, or political ideology, as argued by Powell.

In this case the district court agreed with Powell that "mere friendship" is not enough to establish a constitutionally protected right of political affiliation. (Aplt. App. at 556-57). The district court correctly determined, however, that Walton specifically "alleged that her political affiliation with the Lyons administration, not merely her friendship, led to her termination, and as such, she has sufficiently alleged

30

a constitutional[] violation." (Aplt. App. at 557). The district court then examined Walton's evidence and determined that "Walton has produced sufficient evidence to establish a constitutional violation." (Aplt. App. at 557). Among other things, Powell and Lyons were political adversaries. Although Powell did not run against Lyons in the November 2010, general election, during the campaign leading up to that election Powell aggressively attacked Lyons' record as Land Commissioner, and publicly stated his view that Mr. Rush, if elected, would continue the same policies as Lyons. The Larry Barker report aired shortly after the election. Powell viewed the report, which characterized Walton as a "political appointee" and "crony" of Lyons, and testified that he "had no reason to disbelieve" the report, and that he considers Larry Barker to be the "gold standard" in investigative reporting.

A month after Powell took office, Walton's lawyer, Ms. Hemphill, delivered a letter to Powell in which Ms. Hemphill described Walton's association with Lyons, and warned Powell that retaliation against Walton because of her prior association with Lyons would be "legally actionable pursuant to 42 U.S.C. § 1983." Powell expressed animosity towards Walton by making faces at Walton when she gave presentations at meetings and by telling her that he would be glad to help her find a new place to work if she didn't like her job at the SLO. As the district court observed, the "strongest evidence of retaliation" is the statements Powell made at the

31

April 14, 2011, meeting, at which Powell referred to the Larry Barker report, then talked about "protected employees" in the Lyons administration who "somehow got directions from the front office." Powell made those comments while glaring in an intimidating manner at Walton. A jury does not, as argued by Powell have to engage in "gross speculation" (Aplt. Opening Br. at p. 32), to conclude that Powell's comments about "protected employees" referred to Walton. Powell would have this Court ignore the district court's conclusions that Walton's evidence shows that she had a political affiliation with Lyons. (Aplt. App. at 557-58).

Powell's statements that "Lopez...never took the position that Walton was unqualified for any position" and that there is no evidence that Powell believed that Walton was "the beneficiary of cronyism" (Aplt. Opening Br. at p. 31) are disputed and contradicted by the record. Walton testified by affidavit that Lopez flatly refused to follow Lyon's direction to reclassify the Economist A position to the GM I position. (Aplt. App. at 253). Olah, who became Lopez's supervisor in the second Powell administration, admitted that Lopez stated that she objected to, and had a problem with, the reclassification. (Aplt. App. at 290-91).

With respect to Powell's knowledge of Walton's political affiliation with the Lyons administration, the Larry Barker report labeled Walton as a "political appointee" of Lyons. (Aplt. App. at 256). Powell testified that he considers Larry

32

Barker to be the "gold standard" in investigative reporting and that he had "no reason to disbelieve" the report. (Aplt. App. at 304-306). Those undisputed facts alone show that Powell was aware of Walton's political affiliation with the Lyons administration. The district court correctly concluded that there is sufficient evidence in the record to show that Walton's affiliation with Lyons was political, that Powell knew of that political affiliation, and that Powell retaliated against Walton because of Walton's political affiliation with Lyons and the Lyons administration.

II. **The trial court correctly determined that there are genuine issues of material fact as to whether Walton's political affiliation with Lyons was a substantial or motivating factor in Powell's decision to terminate Walton's employment (Issues 2 and 3).**

In order for Walton to make a *prima facie* showing her that termination violated her First Amendment right of association, Walton had the burden of showing that: 1) she suffered an adverse employment action; 2) her political affiliation was a "substantial" or "motivating" factor underlying the action; and 3) her employment position did not require political allegiance. *See Jantzen v. Hawkins*, 188 F.3d 1247, 1251 (10th Cir.1999) (*citing Mason v. Oklahoma Turnpike Auth.*, 115 F.3d 1442, 1451 (10th Cir.1997). Powell does not argue that the termination of Walton's employment was not an adverse employment action. Clearly it was. Powell also does

33

not argue that Walton's position required political allegiance. It did not.[3] Powell's

appeal addresses only the second element of Walton's *prima facie* case, specifically,

whether Walton's political affiliation with Lyons was a substantial or motivating

factor underlying Powell's termination of Walton's employment.

Powell has inappropriately asked this Court to review the district court's

conclusion that "there is a genuine issue of material fact regarding whether regarding

whether Walton's political affiliation with the Lyons administration was a substantial

or motivating factor in the decision to terminate Walton's position." (Aplt. App. at

559). Under Tenth Circuit precedent, this Court does not have jurisdiction to review

that conclusion. *See Walker,* 451 F.3d at 1154. In any event, as discussed in the

previous section, and in the district court's opinion (Aplt. App. at 557-59), there is

sufficient evidence in the record that Powell knew of Walton's political affiliation

with Lyons, and that Walton's political affiliation with Lyons was a substantial or

motivating factor in Powell's decision to terminate Walton's employment.

With respect to Powell's "temporal proximity" argument, the Tenth Circuit and

other Circuits consider, when evaluating the causation element of a retaliation claim,

---

[3] Walton's Second Affidavit (Aplt. App. at 354) was uncontradicted and establishes that Walton's position was not one for which political allegiance was an appropriate requirement. Powell also has acknowledged that party affiliation was not an appropriate requirement for Walton's position (Aplt. Opening Br. at p. 26)

whether the adverse action is taken in close temporal proximity to the protected activity. In the First Amendment context, the temporal proximity analysis is useful when there is discrete activity, such as protected speech. The temporal proximity analysis is not particularly useful in evaluating an association claim. Walton's status of being politically affiliated with Lyons continued from the time Powell first learned of the affiliation, which was before Powell assumed office, through the end of Walton's employment.

In any event, according to Powell, Powell made the decision to terminate Walton's employment through the implementation of a RIF on April 6, 2011, just three months after he assumed his office. The "proximity" of the date of Powell's decision to terminate Walton, to the date on which Powell took office and had the ability to implement a RIF, is inconsequential. It was Walton's affiliation with Lyons and the Lyons administration, not a discrete act, that resulted in her being targeted.

Powell's contention that the district court "overlooks the fact [that]... Powell neither designed nor had any input into the RIF plan" (Aplt. Opening Br. at p. 35) is baseless. First, Powell admits that he learned of the proposal to eliminate Walton's employment through a RIF as early as April 6, 2011, and that he directed Olah to proceed with the development of the plan for approval by the State Personnel Office

35

(SPO) on that date. The RIF plan was not presented to the SPO until June 10, 2011, and was kept secret from Walton during that time. Powell's admissions show that, at least beginning April 6, 2011, he had "input into the RIF plan."

In any event, there is evidence upon which the jury could reasonably conclude that Powell is not being truthful when he claims that he did not suggest, before April 6, 2011, that a plan be developed to terminate Walton's employment. Powell clearly harbored animosity towards Walton, as evidenced by his conduct towards her from January 1, 2011, through the date of Walton's termination, and clearly harbored animosity towards Lyons, as evidenced by his attacks on the Lyons administration during the campaign, and his repeated statements about allegedly "illegal conduct" in the Lyons administration. Britt, a member of Powell's exempt staff, accused Walton of participating in that allegedly "illegal conduct." Under these facts, a jury could reasonably conclude that Powell directed the targeting of Walton for termination even before April 6, 2011.

### III.    The trial court correctly determined that there is a genuine issue of material fact as to whether Powell's proffered reason for the RIF is pretextual (issue 4).

Walton does not dispute that Powell articulated a legitimate non-discriminatory reason for terminating Walton's employment through a RIF. Walton, however, came forward with ample evidence that Powell's proffered reason is a pretext. Among

36

other things Walton demonstrated that there were at least twelve vacant positions in the SLO at the time of the RIF, and that the SLO could have chosen to eliminate two vacant positions, rather than one vacant position, and Walton's position, in order to reduce the SLO's FTE by two employees as required by the General Appropriations Act. With respect to Powell's claim that eliminating two vacant positions would not address the budget requirement of the General Appropriations Act, Walton demonstrated that any budget shortfall could easily have been remedied by a budget adjustment request (BAR) and that the SLO had increased its remaining budget in 2011 and 2012 by over one million dollars.

Further, despite Powell's claim that two FTEs had to be eliminated, after terminating Walton, the SLO added to its base FTE by hiring several temporary employees who were still serving over a year later. Walton also demonstrated that the SLO could have met the FTE reduction requirement, and met the budget reduction requirement, by not filling one of the three vacant positions that the SLO was actively attempting to fill at the same time that it was designing the RIF.

Olah, the designer of the plan, admitted that the SLO did not consider any alternatives to eliminating Walton's position, and, although Olah claims that the decision to eliminate Walton's position was based upon her comprehensive review of the entire agency, Olah does not have any documentation evidencing her

comprehensive review.  Finally, the SLO had two open positions for which Walton

was qualified on the date the RIF went into effect.  The SLO did not provide Walton

with a right of first refusal as required by N.M. Code 1.7.10.9( C) (Aplt. Opening Br.,

Ex. 4). Instead Powell sent an email to all SLO employees statewide informing those

employees that Walton had been terminated, which was unnecessary and extremely

humiliating to Walton.  Powell now claims that, until twelve days after the expiration

of Walton's right of first refusal, the vacant position Line Manager position was "not

being filled" (Aplt. Appx. at 415).  Powell's delay in filling the position, for which

Walton should have been provided a right of first refusal, is further evidence that the

RIF was a pretext.

　　　Although now Powell claims that he did not know that Olah designed the RIF

to eliminate Walton's position until Olah and Jenks presented the plan to him for

approval, which Powell now claims took place on April 6, 2011, the evidence

concerning Powell's animus towards Walton because of her affiliation with Lyons,

and the fact that Jenks reported directly to Powell and met with him regularly,

supports an inference that Powell knew much earlier.  In any event, even under

Powell's version of the facts, Powell directed Olah to proceed with the RIF plan when

the RIF plan was presented to him on April 6, 2011.  Powell did not even ask whether

Olah had considered other alternatives.  Powell hid from Walton the fact that she was

being terminated until June 10, 2011, which is the same day that Powell announced

to the entire staff of the SLO that Walton's employment was terminated.[4] In light of

Walton's evidence, the district court correctly found "Walton has produced sufficient

evidence for a jury to conclude that the Defendants' proffered reasons are pretextual."

(Aplt. App. at 559). *Compare Butler v. City of Prairie Vill., Kan.*, 172 F.3d 736, 751

(10th Cir. 1999) (In case under Americans With Disabilities Act, summary judgment

was not appropriate because there were genuine issues of material fact regarding

defendant's intent in implementing a RIF).

Powell has argued that Walton's evidence should be evaluated under the

burden shifting analysis established by the Supreme Court in *McDonnell Douglas*

*Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under

*McDonnell,* once a defendant articulates a legitimate non-discriminatory reason for

an adverse employment action, the burden shifts to the plaintiff to show that an issue

of material fact as to whether the proffered reason is a pretext for discrimination.

*McDonnell* applies to claims of "age, race, national origin, gender discrimination, and

---

[4] Powell poses the following highly misleading rhetorical question at page 36 of his
Opening Brief: "Why would Commissioner Powell, after learning of the Barker report of
Walton's supposed cronyism and having received the Hemphill letter, *fight to keep her job*."
[emphasis added]. Powell did not "fight" to keep Walton's job. Powell tried, through the
legislative process, to change the recommendation that the SLO reduce its FTE count by two
positions for fiscal year 2012, which began on July 1, 2011.

retaliation" *Gamez v. Country Cottage Care & Rehab.*, 377 F. Supp. 2d 1103, 1119 (D.N.M. 2005). Powell has not cited any authority for the proposition that the *McDonnell* burden shifting analysis applies to a First Amendment association claim brought pursuant to 42 U.S.C. § 1983. No court within the Tenth Circuit has specifically addressed this issue, other than *Hindman v. Thompson*, 557 F. Supp. 2d 1293, 1309-10 (N.D. Okla. 2008). In *Hindman* the Oklahoma district court ruled that *McDonnell* is not "the proper legal framework" by which to analyze a First Amendment claim; *Accord Dye v. Office of the Racing Com'n*, 702 F.3d 286 , 294–295 (6th Cir. 2012).

In *Dye* the Sixth Circuit held that if a plaintiff makes a prima facie case of First Amendment retaliation, the burden then shifts to the defendant to demonstrate by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct. "Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant. Unlike in the *McDonnell* burden shifting framework, the burden does not shift back to a plaintiff to show pretext." *Dye*, 702 F.3d at 294–295 (internal quotation marks omitted); *Accord Jirau Bernal v. Agrait*, 37 F.3d 1, 3-4 (1st Cir. 1994); *and Charles v. Grief*, 522 F.3d 508, 516, fn 28 (5th Cir. 2008).

In any event, even if this Court applies the *McDonnell* burden shifting framework, Walton has come forward with evidence upon which the jury could reasonably conclude that Powell's proffered non-discriminatory reason for the termination is a pretext. Walton does not, as Powell contends, rely on her "subjective evaluation of the reasons for the termination." (Aplt. Opening Br. at 41). None of the evidence that the district court relied on constitutes Walton's subjective belief. (Aplt. Appx. at 559-60). Although Powell's evidence, if believed, might show that he had a legitimate non-discriminatory reason for terminating Walton's employment, the jury is not obligated to accept Powell's evidence. Walton has come forward with facts, admissible in evidence, which support her contention that Powell's proffered reason is a pretext.

## IV. **Powell's actions were unreasonable in light of clearly established Tenth Circuit precedent (issue 5).**

"The doctrine of qualified immunity shields public officials ... from damages actions unless their conduct was unreasonable in light of clearly established law." *Elder v. Holloway*, 510 U.S. 510, 512, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994). To determine whether a public official is entitled to qualified immunity, the court must first consider whether the plaintiff's factual allegations show that the official's conduct violated a constitutional right, and if they do, the court must then determine

whether the right was clearly established at the time of the alleged conduct. *Gann v. Cline*, 519 F.3d 1090, 1092 (10th Cir. 2008), citing *Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). There need not, however, be precise factual correspondence between earlier cases and the case at hand. *Anderson v. Blake*, 469 F.3d 910, 913-14 (10th Cir. 2006). "[A] general constitutional rule that has already been established can "apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." *Id.*, quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "A plaintiff can demonstrate that a constitutional right is clearly established by reference to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits." *Smith v. Cochran*, 339 F.3d 1205, 1215 (10th Cir.2003).

In *Saucier v. Katz*, 533 U.S. 194, 202, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001), a *Bivens*[5] case involving the assertion of qualified immunity by a law

---

[5] *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619.

42

enforcement official in an excessive force case, the Supreme Court stated: "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Based upon *Saucier*, Powell argues, confusingly and incorrectly, that "[t]he relevant question in this case is whether, given the law on discrimination under the First Amendment for political association and the information possessed by Commissioner Powell at all relevant times, all other similarly situated reasonable officials should have declined approval of the Olah RIF design." (Aplt. Opening Br. at 50).

Contrary to Powell's convoluted statement, under *Saucier*, the "relevant dispositive inquiry" is whether, at the time of Walton's termination, it would have been clear to a reasonable official that terminating a public employee, through the pretext of a RIF, because of the employee's affiliation with the official's political adversary, was unlawful. As discussed in Section I of this Argument, it has long been established that "the First Amendment protects public employees from discrimination based upon their political beliefs, affiliation, or non-affiliation unless their work requires political allegiance." *Mason,* 115 F.3d at 1451; *and See Dickeson,* 844 F.2d at 1442-43. The Supreme Court has articulated that right in a variety of circumstances. For example, in *Elrod v. Burns*, 427 U.S. 347, 359, 96 S.Ct. 2673, 49

L.Ed.2d 547 (1976), the Court held that the First and Fourteenth Amendments protect the employees of a sheriff's department from discharge solely because they were not affiliated with the Democratic party. In *Branti v. Finkel*, 445 U.S. 507, 514-15, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Court held that the First and Fourteenth Amendments protect assistant public defenders from discharge solely because they were Republicans. In *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 72, 76-78, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), the Court held that promotions, transfers, and recalls based on political affiliation or support are an impermissible infringement on public employees' First Amendment rights.

The Tenth Circuit, following *Elrod, Branti, and Rutan,* has recognized a public employee's First Amendment right to be free from discrimination and retaliation because of political affiliation (or non-affiliation) in a wide variety of circumstances. For example, in *Dickeson,* 844 F.2d at 1442-43, this Court held that employees of a sheriff's department have a First Amendment right not to be terminated because they were supporters of the former sheriff. In reversing a summary judgment in favor of the sheriff, the Court stated: "On remand, plaintiffs should be allowed to attempt to prove that they were discharged because of their party affiliation *and/or* association with ex-Sheriff Harvey." *Id.* at 1445 (emphasis added). *Dickeson* made clear, in 1988, that the termination of a public employee because of the employee's affiliation

44

with the defendant's political adversary violates the employee's First Amendment right of association.

In *Laidley v. McClain*, 914 F.2d 1386 (10th Cir. 1990), this Court confirmed that the termination of a public employee, because the public employee supported the defendant's political adversary, violates the employee's First Amendment right of association. This Court held that if the defendant district attorney terminated employees of the district attorney's office because those employees supported the district attorney's opponent, the district attorney would not be entitled to qualified immunity because the "rights at issue ... were clearly established constitutional rights, and ... a reasonable person would have known that refusing to retain or firing a low-level staff employee for exercising those rights was unlawful." *Id.* at 1395.

In *Mason v. Okla. Tpk. Auth.*, 115 F.3d 1442, 1451 (10th Cir.1997), this Court held that the termination of the employment of a public employee, who was politically non-affiliated, to make the position available for a supporter of the Democratic party violated the terminated employee's First Amendment right of association. In *Jantzen v. Hawkins*, 188 F.3d 1247, 1251 (10th Cir. 1999) this Court, citing *Mason,* 115 F.3d at 1451, confirmed again that "[t]he First Amendment protects public employees from discrimination based upon their political beliefs, affiliation, or non-affiliation unless their work requires political allegiance." The *Jantzen* court

45

determined that a sheriff deputy who ran against his boss, the sheriff, in an election

did not have a First Amendment right protecting him from termination because of his

political affiliation because the candidate deputy "put forth no evidence that he was

in any way terminated for 'supporting or affiliating with a particular political party.'"

*Jantzen*, 188 F.3d at 1252.  The Court observed that the only factor driving the

candidate deputy's termination was his "candidacy qua candidacy." *Id.* at 1252.

On the other hand, the *Jantzen* Court determined that three other employees of

the sheriff's department, a jailer and two deputies, who had supported the candidate

deputy's election, did have a First Amendment right to associate with the candidate

deputy.   The Court determined that political allegiance was not an appropriate

requirement for the jailer's position, *Id.* at 1254, and that there were genuine issues

of material fact as to whether political allegiance was an appropriate requirement for

the deputy positions. *Id.* at 1256.  The *Janten* court further determined that, in light

of the Tenth Circuit opinions in *Dickeson v. Quarberg*, 844 F.2d 1435 (10th Cir.

1988) and *Francia v. White*, 594 F.2d 778, 782 (10th Cir.1979), the sheriff "should

have known that it would be unconstitutional to terminate [the jailer and deputies]...

for affiliating with and/or believing in a particular candidate" and that the sheriff

therefore did not have qualified immunity. *Id.* at 1259. *Accord Bass v. Richards*, 308

F.3d 1081, 1090-91 (10th Cir. 2002) (Court held that sheriff's termination of a deputy

46

sheriff because the deputy supported an opponent of the sheriff in an election would violate deputy's First Amendment right of association, and sheriff would not entitled to qualified immunity).

In *Gann v. Cline*, 519 F.3d 1090, 1095-96 (10th Cir. 2008) this Court held that a county commissioner violated the First Amendment right of an employee who was terminated because she did not support the county commissioner in an election. *Gann* amply demonstrates that the contours of a public employee's First Amendment right to be free of political patronage were very clearly established in 2008, which was two years before Powell engaged in the patronage termination of Walton at issue in this case. In *Gann* a county commissioner in Oklahoma, Reinhart, fired a county requisitions manager, *Gann*. In her complaint, Gann alleged that Reinhart fired Gann, and replaced Gann with Dyer, "because Ms. Dyer demonstrated her political loyalty to Mr. Rinehart by supporting his campaign while Ms. Gann failed to do so." *Gann*, 519 F.3d at 1092. The Tenth Circuit first held that Gann "... sufficiently alleged that Mr. Rinehart's conduct constituted a constitutional violation." *Gann*, 519 F.3d at 1095. Reinhart argued, however, that he was entitled to qualified immunity because at the time of his conduct, the First Amendment right to "non-affiliation" was not clearly established. *Gann*, 519 F.3d at 1095. In rejecting Reinhart's argument, this Court reviewed several Supreme Court and Tenth Circuit cases involving political

patronage decisions, and held that "[e]ven if the facts of controlling precedent do not precisely match those of the instant case, such precedent nonetheless placed Mr. Rinehart on reasonable notice that his conduct was unlawful." *Gann,* 519 F.3d at 1096.

Similarly, in this case, Powell was on reasonable notice that his termination of Walton's employment because of Walton's political affiliation with Powell's predecessor, Lyons, was unconstitutional. The contours of the right of public employees to be free from retaliation based upon their "political beliefs, *affiliation,* or non-affiliation, unless their work requires political allegiance", *Jantzen,* 188 F.3d at 1251 (emphasis added), was sufficiently clear in June 2010 such that a reasonable official would understand that terminating Walton's employment because of her political affiliation would violate that right. *See Mason,* 115 F.3d at 1451; citing *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 68–69, 110 S.Ct. 2729, 2733–34, 111 L.Ed.2d 52 (1990); and *Branti v. Finkel*, 445 U.S. 507, 513, 100 S.Ct. 1287, 1292, 63 L.Ed.2d 574 (1980). Accordingly Powell does not have qualified immunity from Walton's claims. *See Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

Walton has shown she was politically associated with Lyons, and that Powell knew of the political affiliation. Powell knew that Lyons, Powell's predecessor and

political adversary, hired Walton into an exempt position, and then directed Walton's transfer to a classified position before the election in which Powell was elected, thus providing Walton with the protections of the New Mexico State Personnel Act. Shortly after defeating the Republican candidate in the 2010 general election, and before taking office, Powell viewed the Larry Barker report in which Walton was described as a "political hire" and crony of Lyons. Powell, who considers Larry Barker to be the "gold standard" in investigative reporting testified that he had "no reason to disbelieve" the report, and took the information "under advisement." After taking office, Powell and his staff displayed animosity towards Walton because of her affiliation with Lyons to the point that Walton asked her attorney, Linda Hemphill to write to Powell, and warn Powell that retaliation against Walton because of her affiliation with Lyons would violate Walton's First Amendment right of association.

Although Powell asserts that he did not learn of the proposal to eliminate Walton's employment through a RIF until April 6, 2011, a jury could reasonably conclude that Powell made it known to his exempt staff, with whom he frequently consulted, including Britt, Olah, and Jenks, that he wanted to terminate Walton's employment. In any event, even under Powell's version of the facts, the RIF proposal was presented to Powell on April 6, 2011. Powell did not inquire as to whether his RIF designer, Olah, had explored alternatives to eliminating Walton's position. It is

49

not disputed that there were alternatives that would satisfy the legislative mandate to reduce the SLO's FTE count by two positions and to reduce the budget. It is not disputed that Olah did not review any alternatives, and that Powell never even asked Olah whether she had explored other alternatives. A jury could reasonably conclude, under these facts, that Powell approved the RIF proposal in order to terminate Walton's employment because of Walton's political affiliation with Lyons.

Construing the facts in the light most favorable to Walton, *Dickeson v. Quarberg*, 844 F.2d 1435 (10th Cir. 1988), Walton has shown that she had a protected political affiliation with Lyons, and had a First Amendment right not to be terminated because of her affiliation with Lyons. The district court, after carefully reviewing applicable Supreme Court and Tenth Circuit precedent, correctly concluded that "...a reasonable official ... would know that a public employee had the right not to be terminated based on her political affiliation with a prior administration..." and that Powell is not entitled to qualified immunity under the facts alleged by Walton. (Aplt. Appx. at 564).

## CONCLUSION

The district court correctly determined that there are genuine issues of material fact as to whether Walton's political affiliation with Lyons and the Lyons administration was a substantial or motivating factor in Powell's decision to terminate

Walton's employment. The district court correctly determined that there are genuine issues of material fact as to whether Powell's proffered reason for the termination is a pretext. Under controlling Tenth Circuit precedent, this Court does not have jurisdiction to review those determinations. *See e.g. Walker v. City of Orem*, 451 F.3d 1139, 1154 (10th Cir.2006). This Court must accept as true the district court's determination that a reasonable jury could find the facts in favor of Walton. *Pahls v. Thomas*, 718 F.3d 1210, 1217 (10th Cir. 2013). The district court correctly denied Powell's motion for summary judgment in which Powell sought dismissal of Walton's claim on factual grounds.

The district court correctly concluded that, under the facts alleged by Walton, Powell does not have qualified immunity. Walton alleged sufficient facts to demonstrate that Powell violated her First Amendment right of association by terminating Walton's employment because of Walton's political affiliation with Lyons. Walton demonstrated, and the district court correctly concluded, that a public employee's right of political affiliation with an official's political adversary was clearly established many years before Powell terminated Walton's employment. The district court correctly concluded that a reasonable official would know that a public employee has the right not to be terminated based on her political affiliation with a prior administration, and that Powell is therefore not entitled to qualified immunity

51

under the facts alleged by Walton.  The district court correctly denied Powell's motion for summary judgment in which Powell sought dismissal of Walton's claims on the ground of qualified immunity.

## CERTIFICATE OF COMPLIANCE

I certify that Appellee's Brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because it contains 12,045 words, excluding parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(3).

I further certify: (1) Any privacy redactions have been made; (2) that the hard copies submitted to the Court are exact copies of the version submitted electronically; and (3) the electronic submission has been scanned for viruses using the most recent version of Symantec Virus and Spyware Protection.

## STATEMENT REGARDING ORAL ARGUMENTS

Walton's counsel request oral arguments in this case.  Counsel submits that oral arguments will significantly aid the decisional process as this case involves complex issues regarding qualified immunity and the standard of review of cases denying summary judgment to public officials on the ground of qualified immunity.

Respectfully submitted this 19th day of February, 2015.

> SOMMER, UDALL, SUTIN, HARDWICK,
> & HYATT, P.A.,
> Attorneys for Plaintiff
> By:   /s/ Jack N. Hardwick
> Jack N. Hardwick
> P.O. Box 1984
> Santa Fe, New Mexico 87504-1984
> (505) 982-4676

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of February, 2015, I filed the foregoing electronically through the CM/ECF system, which caused the parties and counsel registered to receive electronic service to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Scott P. Hatcher
Emma D. B. Weber
HATCHER & TEBO, P.A.
150 Washington Avenue, Suite 204
Santa Fe, New Mexico 87501
(505) 983-6525

> /s/ Jack N. Hardwick
> Jack N. Hardwick